**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LANEY & DUKE STORAGE WAREHOUSE CO., Inc., and Laney & Duke Terminal Warehouse Co., Inc., Respondents.**

No. 22963.

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Marcus W. Sisk, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Glen M. Bendixsen, Atty., N.L.R.B., Washington, D.C., for petitioner.

O. R. T. Bowden, David A. Bartholf, Hamilton & Bowden, Jacksonville, Fla. for respondents.

Before WISDOM, BELL, and GOD-BOLD, Circuit Judges.

GODBOLD, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order against Respondents, pursuant to § 10(e) of the National Labor Relations Act (29 U.S.C.A. § 151 et seq.)

Respondents, two corporations operating as a single employer (hereinafter, the company), operate warehouses in Jacksonville, Florida. United Steelworkers of America, AFL-CIO, won a Board-conducted consent election held December 20, 1963. The company filed objections to the election, and the Board adopted the findings of the Regional Director recommending the objections be overruled, and certified the Steelwork-

ers as bargaining agent, on March 24, 1964.

### A. Pre-election violations

▮ There is abundant evidence of flagrant pre-election violations by the company of § 8(a) (1) of the Act—interrogation of employees about union activity, encouragement to engage in anti-union activity, surveillance of union activity, promises of economic benefits and threats of economic reprisals. The company's position on this issue is simply that the Trial Examiner should have rejected the testimony of Board witnesses as not credible and accepted the company's evidence. The findings by the Trial Examiner of pre-election violations are not clearly erroneous, in fact are fully supported by substantial evidence on the record considered as a whole. An enforcement order is appropriate as to these violations.

### B. The Election

The company filed an objection to the election on the ground Herbert Amos, a union observer and leader in organizational activity, wore a union button throughout the day of the election and during the balloting. The button was 1⅜ inches in diameter, red, white, and blue in color, and bore on it stars and the inscription, "Vote U.S.A." Amos was wearing it during the pre-election conference, held immediately preceding the balloting, and attended by the company attorney and representatives and company election observer, and the Board representative. He was identified to those present as the union observer. No objection was made to the union button. The election began at 4:00 p m. Shortly before the polls opened official NLRB observers' badges were passed out, and Amos pinned his on his shirt two or three inches below the union button. Ob-

jection was first made after the balloting at the vote count. The Regional Director investigated, concluded that the wearing of the button did not interfere with the employee's freedom of choice, and recommended the company's objection be dismissed, which the Board did.

The company relies on NLRB Form 722, "Instructions to Election Observers," [1] and the provisions of the Board's Notice of Election stating "Electioneering will not be permitted at or near the polling place," and the general policy of the Board requiring "laboratory conditions" at an election. The company also claims that the letters "U.S.A.," being the same as the abbreviation for United States of America, were coercive in implying approval by the federal government of the union's cause.

▮ In passing on objections to elections it is for the Board to decide whether the conduct charged reasonably tends to interfere with the voters' free choice. NLRB v. Dallas City Packing Co., 5th Cir., 1958, 251 F.2d 663. Judicial review is limited to ascertaining whether the Board's determination is within reasonable bounds. Olson Rug Co. v. NLRB, 7th Cir., 1958, 260 F.2d 255. The burden was not on the Board to show the election was fairly conducted but on respondents to show it was not. NLRB v. O.K. Van Storage, Inc., 5th Cir., 1961, 297 F.2d 74.

▮ The Board has held that the wearing by election observers of buttons or similar insignia bearing the name of the union will not invalidate the election, Western Electric Company, Incorporated, 87 NLRB 183 (1949); and that the presence of the additional word "vote" does not invalidate, Electric Wheel Company, 120 NLRB 1644 (1958). We do not in this case adopt a principle that under

---

1. "THINGS NOT TO DO * * * 7. Wear any indication of the organization which you represent except the observer badge provided by the Board. This includes badges, buttons, placards, electioneering devices, etc., including advertising on any article of clothing. The Board agent is the sole arbiter as to the type of identification to be worn during the election. This, of course, does not apply to regular company identification badges, the wearing of which is required by the company."

no circumstances can wearing of forbidden buttons or insignia by an observer invalidate the election. We do hold that under the circumstances here presented the Board's determination, which included consideration of the abbreviation "U.S.A.," was not unreasonable. As pointed out in *Western Electric* the identity of the union observer, and his special interest, are generally known to the employees, and, we add, the name of and abbreviation for the union are generally known also.

### C. The Application Forms

On January 24, 1964, the company distributed to some employees an "employment application" with instructions to fill it out and return it. The four-page form called for extensive personal data about the "applicant" of the nature generally required for personnel files of a business. But it also required the "applicant" to agree to take mental examinations or polygraph tests at the company's request or resign upon refusal to do so, to agree that his employment would be probationary for a period of six months and if laid off that he would be considered for reemployment only for a period of 60 days, and to agree to accept present and future policies, rules and regulations of the company including transfer from one department to another at the direction of the company. See LeRoy Machine Co., Inc., 147 NLRB 1431, 1438–39, holding a requirement that tardy and absentee employees take physical examinations is a condition of employment. The form called for the signature of the applicant and of one witness. Previously a single-page application form had been used for some employment applications, in other cases no form at all; such of the simpler forms as the company had were destroyed in a fire nine months before.

The day following there was a union meeting at which the forms were discussed, particularly that they read as though the company could discharge the employees who signed and hire others. The employees complained to union representative Mills, who was present, about the forms. Employee Herbert Amos, who was recognized as a leader in union activities, told Mills there would have to be "some understanding" about the forms before he signed. After discussion the employees decided they would not turn in the forms and turned them over to Mills instead. Mills designated Amos to go to the homes of members not present and pick up their forms; Amos did so and turned them over to Mills.

On January 27, Mills wrote the company stating the forms were matters of collective bargaining and suggesting the matter be held in status quo until the union's certification, not then issued, was issued. (Company attorneys replied to this letter on February 7.)

On January 28 forms were distributed to more employees, some of whom turned them over to Amos at his request. The following day the company notified Amos he had company property (i. e., the forms) without its consent and demanded return of the applications. There ensued a series of discussions involving Amos and the company and Amos and Mills, and all applications held by Amos and Mills were returned. On Thursday Amos was suspended for two weeks without pay on the ground he had taken company property by taking possession of the forms and had lied repeatedly about them.

As a matter of business judgment the company was entitled unilaterally to require information from present employees but not by unilateral action to require answers the giving of which changed or affected conditions of employment. The action of the employees in holding the union meeting, agreeing not to turn the forms in and instead turning them over to Mills, and subsequent collection by Amos (at the designation of Mills) of other forms, were concerted activities about a matter legitimately the subject of organized activity and concerted protest—unilateral changes in conditions of employment—and as such were protected by § 7 of the Act.

■ Most concerted activities engaged in for the purpose of presenting to an employer complaints concerning working conditions are protected under § 7 (subject to exceptions not here applicable) and discharge of an employee for engaging therein is a violation of § 8(a) (1). NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298.[2] Whether gathering and withholding the forms was wise or unwise is not the test of the legality of such concerted action if it is a protected activity. NLRB v. Holcombe, 5th Cir., 1963, 325 F.2d 508.

■ The Board found Amos had not lied about having the applications, and this finding is adequately supported by the record. The company's belief, even if bona fide, that he had lied is not a defense. § 8(a) (1) is violated if the discharged employee was engaged in a protected activity, the employer knew it was such, the basis of the discharge was an alleged act of misconduct in the course of that activity, and the employee was not, in fact, guilty of that misconduct. NLRB v. Burnup & Sims, Inc., 1964, 379 U.S. 21, 23, 85 S.Ct. 171, 13 L.Ed.2d 1; NLRB v. Jackson Tile Manufacturing Company, 5th Cir., 1960, 282 F.2d 90. Thus, this suspension of Amos violated § 8(a) (1). It also violated § 8(a) (3); prior to the suspension the company knew that the taking up of the applications was a union endeavor and not a mere personal undertaking by Amos. NLRB v. Bowman Transportation, Incorporated, 5th Cir., 1963, 314 F.2d 497.

■ Since the application forms affected conditions of employment they were a legitimate subject of collective bargaining. The unilateral action of the company relating thereto constituted a refusal to bargain, and it is not excused by the fact it occurred before certification. NLRB v. Zelrich Co., 5th Cir., 1965, 344 F.2d 1011.

■ The duty to bargain is a continuing one, and a union may legitimately bargain over wages and conditions of employment which will affect employees who are to be hired in the future. See LeRoy Machine Co., Inc., supra, where the Board held the fixing of wage rates on new jobs to be a proper subject of bargaining. To the extent that application forms, used in hiring new employees in the future, contain questions the answers to which affect conditions of employment, the union is entitled to bargain with respect thereto.

The order is to be enforced as to this suspension of Amos. The company should not be forbidden to use in the future personnel data forms for present employees and employment application forms for new employees, but subject to the obligation to bargain as to terms and conditions of employment and subject to the condition they not be used for anti-union purposes. Having made this determination, which will require the company to use new forms, if it wishes to use any, we see no need to deal with the contention of the Board that distribution of the four-page forms was in and of itself a violation of § 8(a) (1).

### D. The Discharges of Johnson, Nealy, Rose and Pollard

Around 9:00 a. m. January 16, 1964, three weeks after the election, Thomas Bingham, vice president in charge of operations, posted a notice on the warehouse bulletin board.[3] **The company's**

2. The concerted activity over the applications was successful. When the company responded to Mills' letter, a week after suspending Amos, it stated that some of the inquiries on the forms were intended for new employees and not for present employees, that there was never a "requirement" that present employees sign them, that none of the employment conditions would apply to present employees even if the company insisted on their being signed, and that signatures of new applicants would not be required while certification was pending.

3. "January 16, 1964
NOTICE
The Company has decided to put on a night shift beginning Friday January 17th, and will need 7 men for this work. In line with our past practice, we will pay

position is that the second sentence of the second paragraph meant any member of the day unloading crew who did not sign up for the new night crew thereby indicated he did not desire to work and his employment automatically terminated. If this is what the company meant it did not say so clearly, if at all.

The four employees here involved, who worked on the day unloading crew, did not sign the notice. They reported for work on the newly-created night unloading crew at the time and place stated by the notice and were told they had been fired or had "had it." The company made no inquiry, neither previously nor at that time, whether by not signing they intended to give up their employment.

The following is only a portion of the substantial evidence in the record supporting the Board's conclusion that these discharges violated § 8(a) (1) and (3). All four were competent employees. Three had worked for the company between three and five years, one for 17 years. Creation of a night shift had been under discussion for more than a month and a decision made more than a week earlier, but only one day's opportunity was given to sign; there is no company explanation for this. Stripling, one of the men in charge of the new night crew, was told by an officer he could have his old (day) crew, which included all of these four employees. There is evidence all four men were told by the day-crew "pushers" under whom they worked to report for duty on the night crew, and that some of them were specifically told they need not sign the notice. When Stripling reported to take over the night crew he expected his old day crew to be on it and was surprised when they were not. He reported to an officer that he had notified two of the

four here involved to report for the night work, but the officer did not even reply. The time cards of the four men had been removed from the rack when they reported and their pay checks had been prepared and were handed to them immediately.

Only five employees signed (including two who were personally recruited by management; one of these was an "extra" worker). A nine-man crew was constituted instead of seven men as shown on the notice. Only three of those who signed were put on the crew; the company recruited the other six from casual (i. e., temporary) employees, and laid-off employees and men who had not previously worked for the company. There were two vacancies on the crew within a few days; one was filled by a casual employee, the other by an employee who had been out with an injury on January 16 and was allowed by management to sign up on the 17th. None of the two additional places included in the original crew and the two immediate vacancies was offered to any of the four terminated employees. The new night crew was not as efficient as the old day crew had been.

All four of the terminated employees were union men and had participated in the organizational effort; at least three had attended meetings. There is evidence all had been interrogated, and two threatened, by company officers.

The company's position is that if it chose to set up a crew this way and discharge, or treat as resigned, those who did not sign, it was free to do so. The evidence from the whole record strongly supports the inference of improper motive and the findings of the Board that these discharges violated § 8(a) (1) and (3), Universal Camera Corp. v. NLRB,

a five cents (5¢) per hour premium for such work.

The shift will begin at 4:30 P.M. and will end at 1:00 A.M. with thirty (30) minutes off for supper. The type of work will be unloading and any other type needed, taking the place of the day unloading crew.

If you are interested in this work you may sign below and will be considered according to ability and seniority. Those interested, sign up TODAY Thursday January 16, 1964.

Work force needed 3 forklift drivers, and 4 warehousemen.

(Lines for signatures.)"

1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; NLRB v. Brennan's, Inc., 5th Cir. 1966, 366 F.2d 560; 368 F.2d 1004; NLRB v. Great Dane Trailers, Inc., 5th Cir. 1966, 363 F.2d 130.

 The company contends there is no direct evidence it knew of the union affiliations and activities of the four employees, relying on NLRB v. Atlanta Coca-Cola Bottling Company, 5th Cir., 1961, 293 F.2d 300. The burden is upon the Board to establish knowledge of union activity and a causal relation between knowledge and discharge. Schwob Manufacturing Company v. NLRB, 5th Cir., 1962, 297 F.2d 864, 873. But, as the Coca-Cola case points out, proof of the discriminatory purpose is rarely direct and may be established by circumstantial evidence. In *Coca-Cola* less than half those discharged were union members; here all were. *Coca-Cola* involved a balancing of economic motives against anti-union bias, and the Court found economic motivation to prevail; here there is economic motivation for creating a night crew, but no reason or explanation for constituting it in such a way that long-time and skilled employees were replaced by temporary and new employees of less efficiency (some recruited by management for unfilled places), no reason for a one-day signing period nor for absence of a clear statement that failure to sign meant loss of employment. The explanation offered for the procedure is that if management wants to operate this way it is entitled to do so; this alone is not a legitimate management reason. We are not balancing inferences of equal weight, but strong evidence against no explanation at all. The Board was entitled to infer that these discharges, against a pattern of pre-election interrogations, encouragement of surveillance and tale-bearing and post-election refusals to bargain, were made for improper motives. See the discussion of *Coca-Cola* by Justice Friendly in Majestic Molded Products, Inc. v. NLRB, 2d Cir., 1964, 330 F.2d 603, 606.

**E. The Second Suspension of Amos**

 Within a few days after return from his first suspension Amos was observed by an officer operating his fork lift with the load not secure, and part of the load fell off and was damaged. He was reprimanded and replied, "That is the way I got it." (The load was placed on the lift by others.) About two weeks later Amos again dropped part of a load from his lift and was observed by the same officer. He was given what was, under his own testimony, a very restrained reprimand—"Amos, you have to be more careful with the merchandise." His reply was flagrantly discourteous— "Mr. Laney, I couldn't help that. Jesus Christ, don't you see how the merchandise is laying over the pallet." Forthwith the officer suspended him for a week.[4] There is evidence that other employees had dropped loads without being suspended, but none that any employee had, shortly after one reprimand for such carelessness, repeated the offense; and in any event the response which Amos acknowledges he gave, to a deserved reprimand, supported disciplinary action. The evidence of legitimate motive by the employer is sufficiently compelling that implications of illegality cannot control this suspension; the substantial evidence on the record as a whole is that it was not a violation of the Act. NLRB v. Brennan's, Inc., supra; NLRB v. Great Dane Trailers, Inc., supra.

The Board order is to be enforced as to loss of pay, plus interest, for Amos' first suspension, but not as to the second suspension.

**F. Refusals to Bargain**

We have dealt in C. above, with refusal to bargain over the application forms. We now deal with other refusals to bargain.

4. Two new employees who were in the vicinity were asked by the company to sign statements about the occurrence; both refused, saying they had not seen it; the next day one of them was discharged.

After certification on March 24, 1964, the union by letter requested bargaining, and the company by letter refused on the ground it did not recognize the certification. The certification being valid refusal to bargain violated § 8(a) (1) and (5). If an employer refuses to bargain on the ground the election which preceded the certification was invalid, it does so at its own risk. If it successfully proves the election was invalid it will not be ordered to bargain. NLRB v. Houston Chronicle Pub. Co., 5th Cir., 1962, 300 F.2d 273. But if it is unsuccessful an order by the Board based on the refusal to bargain will be enforced. Anchor Manufacturing Co. v. NLRB, 5th Cir., 1962, 300 F.2d 301.

The company for business reasons had the right to change from day to night unloading operation, but this was an alteration in wages, hours and working conditions of employees. The Board has held conditions of employment to include a change in daily work days from 7:00 a. m. to 4:30 p. m. (with 30 minutes for lunch) to 8:00 a. m. to 5:00 p. m. (with 60 minutes for lunch). Fleming Manufacturing Co., Inc., 119 NLRB 452, 464; a rearrangement of work schedules so some work must be done on Saturday and Sunday, Timken Roller Bearing Co., 70 NLRB 500; and the reemployment of employees who are to be laid off, Hagy, Harrington & Marsh, 74 NLRB 1455. The bargaining representative was entitled to be notified and to bargain on such matters as what employees would be transferred to the night shift, what would happen to the employees on the day unloading crew, and what wage rate would be paid for the night work. Armstrong Cork Co. v. NLRB, 5th Cir., 1954, 211 F.2d 843.

The change was made and announced by the company after the election and before certification, without notice to or consultation with the union. This unilateral action was a refusal to bargain. NLRB v. Zelrich Co., supra.

## G. The Scope of the Order

Considering the conduct and activities of the company hereinabove set out, the requirement by the Board of a broad form cease and desist order was not inappropriate or unreasonable. NLRB v. Moore Dry Kiln Company, 5th Cir., 1963, 320 F.2d 30.

However, the Order and the Notice must be changed in some respects. The Notice requires the company to promise it will not "make any other promises to our employees we do not intend to keep;" this broad obligation must be deleted. Without any reference limiting the scope to the National Labor Relations Act the Notice commits the company that it "will not interfere in any manner with the rights of our employees under the law, or force them to give up any of their rights under the law;" this must be limited to the law that the Board is engaged in enforcing. It requires the company to "get together with the union, whenever the union asks us;" the company is required by the Act to bargain only at reasonable times. It provides "We will not promise to restore the raises which our employees used to get every year before they joined the union;" presumably this is meant to be limited to a promise made for anti-union purposes; unless so limited we doubt the employees will greet this restriction with enthusiasm.

The requirement of the Recommended Order that the Notice be read by management to any employee who requests it, as amended by the Board to require it be read to each employee, singly or collectively, is unnecessarily embarrassing and humiliating to management rather than effectuating the policies of the Act.

The Order goes too far in directing the company to cease and desist from unfair labor practices with "any other labor organization." Before the Steelworkers were certified the employees were represented by another union, and the record shows no unfair practice during that period.

There is no foundation for the contention of the company that the Order by its terms should limit the requirement of bargaining to some fixed period; the duty imposed by the Order is for no greater period than otherwise imposed by law.

The petition to enforce is granted to the extent indicated by this opinion and otherwise is denied.