725 F.2d 1416
 115 L.R.R.M. (BNA) 2571, 233 U.S.App.D.C. 310,
99 Lab.Cas. P 10,750
 FUGAZY CONTINENTAL CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
FUGAZY CONTINENTAL CORPORATION, Elite Services, Inc., and
Ganser's Auto Service, Inc., Respondents.
 Nos. 83-1045, 83-1297.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 13, 1983.
Decided Jan. 20, 1984.
 
 Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.
 Sanford E. Pollack, Newlett, N.Y., with whom Stewart M. Kirshenbaum, Brooklyn, N.Y., was on the brief, for Fugazy Continental Corp., et al., petitioner in No. 83-1045 and respondents in No. 83-1297.
 Michael D. Fox, Washington, D.C., of the Bar of the Supreme Court of Wisconsin, pro hac vice by special leave of the Court, with whom Elliott J. Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on the brief, for respondent in No. 83-1045 and petitioner in No. 83-1297.
 Before WALD and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.
 Opinion Per Curiam.
 
 PER CURIAM:
 
 1
 This case is before us on a petition by Fugazy Continental Corporation to review and set aside an order of the National Labor Relations Board (NLRB) in Fugazy Continental Corp., 265 NLRB No. 165 (1982),[1] and on the NLRB's cross-application for enforcement of that order. The Board found that Fugazy[2] and Ganser's Auto Service, as Fugazy's alter ego, had violated the National Labor Relations Act (NLRA) by engaging in a bad faith attempt to evade their duty to bargain with the representative of their employees, threatening to discharge employees and to shut down operations in retaliation for union activities, coercively interrogating employees about their union activities and sympathies, soliciting support for a rival union, promising benefits to employees if they refrained from union activities and denying accrued vacation pay to employees because of those activities. Fugazy does not contest most of the unfair labor practice findings; it appeals only from three aspects of the Board's decision and order: (1) the critical finding that the transfer of auto repair operations from Fugazy to Ganser's was a sham, and that Ganser's was therefore the alter ego of Fugazy; (2) the allegedly discriminatory denial of vacation benefits; and (3) the alleged refusal to bargain. For the reasons stated below, we deny Fugazy's petition for review and grant enforcement of the Board's order in all respects.
 
 I. FACTS
 
 2
 Fugazy Continental Corporation, which has offices throughout New York City, is engaged in providing limousine and other transportation services.[3] Amalgamated Local Union 355 ("Local 355" or "the Union") began its organizing drive among the eleven employees at Fugazy's auto repair shop in Queens Village in February, 1978. In mid-March, Local 355 held meetings and distributed authorization cards. On March 17, the Union presented eight signed cards to Fugazy and demanded recognition. When Fugazy refused this demand the Union filed an election petition with the NLRB the next day. In early April Fugazy began the illegal and coercive campaign against the Union that ultimately led to numerous serious unfair labor practice findings.[4]
 
 
 3
 On May 31, 1978, Local 355 won the Board-conducted election.[5] The following day Fugazy informed the Union that it had sold the service shop to Stefan Ganser and Ronald Marra, supervisors who were leading participants in the illegal anti-union campaign, and would cease operations by June 12. Ganser reopened the shop on June 12 as Ganser's Auto Service. He hired none of the former employees except for one, Samuel Davis, who had not supported Local 355.[6]
 
 
 4
 The Union filed unfair labor practice charges which ultimately led to a decision by the Board finding Fugazy to have committed many serious unfair practices during the anti-union campaign. These findings were in accord with the ALJ's decision in almost all respects. However, unlike the ALJ, the Board found that Fugazy's failure to pay accrued vacation benefits upon terminating the employees on June 9 was in retaliation for their union activities and violated sections 8(a)(1) and 8(a)(3) of the Act. It further found, contrary to the ALJ, that the sale to Ganser was not a bona fide transfer and that Fugazy was therefore responsible for the discriminatory discharge and refusal to rehire the shop employees by its alter ego, Ganser's, and for the refusal to bargain with the union upon its election victory on May 31. Fugazy appeals from only three of the Board's findings: (1) that Ganser's was the alter ego of Fugazy, (2) that vacation pay was discriminatorily denied, and (3) that Fugazy had a duty to bargain with Local 355 as of May 31, 1978.
 
 II. THE ALTER EGO FINDING
 
 5
 Under well-established NLRB doctrine, one entity is responsible as the alter ego for another's unfair labor practices if an apparent transfer of operations is not an "arms length" transaction between distinct entities, Local No. 627, International Union of Operating Engineers v. NLRB, 518 F.2d 1040, 1045-46 (D.C.Cir.1975), aff'd on this issue per curiam sub nom. South Prairie Construction Co. v. International Union of Operating Engineers, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976), but merely a sham, creating a "disguised continuance" of the predecessor's operations. Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942); NLRB v. Al Bryant, Inc., 711 F.2d 543, 553 (3d Cir.1983); Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., 690 F.2d 489, 508 (5th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Among the factors that enter into a determination of alter ego status are substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between the old entity and its successor. See NLRB v. Al Bryant, Inc., 711 F.2d at 553-54; Carpenters Local Union No. 1846, 690 F.2d at 507; Amalgamated Meat Cutters and Butcher Workmen v. NLRB, 663 F.2d 223, 226-27 (D.C.Cir.1980); NLRB v. Scott Printing Co., 612 F.2d 783, 786 (3d Cir.1979). In addition, the Board will give substantial weight to evidence that the motive for the transaction was to evade statutory and contractual duties under the NLRA or to escape the reach of the Board's remedies. Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945); Southport Petroleum Co. v. NLRB, 315 U.S. at 106, 62 S.Ct. at 455; NLRB v. Al Bryant, Inc., 711 F.2d at 553; Penntech Paper, Inc. v. NLRB, 706 F.2d 18, 24 (1st Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); Carpenters Local Union No. 1846, 690 F.2d at 508; NLRB v. Tricor Products, Inc., 636 F.2d 266, 270 (10th Cir.1980).
 
 
 6
 The Board pointed to several aspects of the transfer from Fugazy to Ganser in support of its conclusion that "the sale was a hastily and haphazardly arranged maneuver to continue Fugazy's operations in a disguised form while avoiding its obligations and responsibilities under the Act."[7] The Board points first to the irregular practices and lack of formalities surrounding the transfer. For example, no formal purchase agreement was prepared until two months after the purported sale, after the issue of alter ego status had been raised by the NLRB in unfair labor practice proceedings.[8] The Board continued:
 
 
 7
 We consider it significant that Fugazy directed and managed both ends of the transaction and continues to retain a financial interest in Ganser's Auto Service. Fugazy, not Ganser, solicited Ronald Marra's participation as a partner in Ganser's Auto Service. Fugazy, not Ganser, insured the operations and employees of Ganser's Auto Service until mid-August. Fugazy, not Ganser, continues to assume direct responsibility for Ganser's Auto Service's electric bills, secretaries, guards, and bill collectors. The belatedly signed purchase agreement provides that Ganser's Auto Service will maintain and repair all vehicles owned, leased, or operated by Fugazy at its Queens Village location and that Ganser's Auto Service will return 8 percent of its gross receipts on these operations to Fugazy. The agreement even goes so far as to specify the days and hours which Ganser's Auto Service must be open. The umbilical relationship between Fugazy and Ganser's Auto Service is further demonstrated by the fact that, until proceedings began in this case, all of Ganser's Auto Service's business consisted of work for Fugazy; since November 22, 1978, Ganser's Auto Service has performed work for outsiders on a small scale. It is clear that Ganser's Auto Service "virtually exists at the sufferance" of Fugazy Continental Corporation.[9]
 
 
 8
 Finally, the Board points to the overwhelming coincidence in the timing of the June 1 "sale" and Fugazy's loss in the May 31 election after a highly coercive campaign of serious unfair labor practices, much of which focused on the threat to discontinue operations.[10]
 
 
 9
 Fugazy argues that common ownership, not present here, is virtually a sine qua non of a finding of alter ego status, citing our decision in Amalgamated Meat Cutters v. NLRB, 663 F.2d 223 (D.C.Cir.1980). In that case, we upheld a decision of the Board refusing to find an alter ego relationship, relying heavily on the absence of any significant financial interest retained by the former entity in its successor. Id. at 227. Fugazy ignores not only the fact that it has retained a substantial financial interest in Ganser's operations--$2000 per month in rent and eight percent of its gross income[11]--but also the presence here of many additional factors, such as the overwhelming evidence of anti-union animus and the extremely suspicious timing and informality of the transaction, not present in Amalgamated Meat Cutters. In any event, common ownership is not an absolute prerequisite to a finding of alter ego status. J.M. Tanaka Construction, Inc. v. NLRB, 675 F.2d 1029, 1035 (9th Cir.1982); NLRB v. Scott Printing Corp., 612 F.2d 783, 786 (3d Cir.1979).
 
 
 10
 Fugazy points primarily to two factors, both relied on by the ALJ in concluding that there was no alter ego relationship, which it claims demonstrate the error of the Board's conclusion: First, the commencement of negotiations several months before the arrival of the Union and, second, the substantial losses that Fugazy had suffered in its service operations and that Fugazy claims were the true motivation for the sale. The Board considered both of these objections in its decision, but found them insufficient to overcome the factors already discussed. Specifically, the Board concluded that although informal negotiations had taken place they were not carried through to completion or formalized until after the "ferocious anti-union campaign" failed to prevent the employees from voting for the Union. The Board also concluded that the ALJ had placed too much weight on Fugazy's financial losses; it was convinced, in light of the undisputed evidence of anti-union animus and conduct, the extremely suspicious timing of the transaction, and the continuation of "the same business, in the same location, with the same supervisors, for the benefit of the same party, Fugazy itself," that the financial losses were not the true motivation for the transaction.[12] Although it is possible that the evidence might also support a contrary conclusion, we hold that the Board's finding of alter ego status is supported by substantial evidence in the record.[13]III. DENIAL OF VACATION BENEFITS
 
 
 11
 Although the ALJ had concluded, without discussion, that Fugazy had not discriminatorily denied vacation benefits because "[t]he record evidence reflects that Respondent did not have a clear and certain practice with respect to granting vacations to shop employees,"[14] the Board in its decision concluded just the opposite. The Board based its finding on a companywide memorandum dated February 17, 1978, and appearing in the record, J.A. 704, setting out a policy of granting two weeks of vacation pay after one year's employment. The Board found that Fugazy had denied accrued vacation pay to the terminated employees because of their support of the Union, and thus violated sections 8(a)(1) and 8(a)(3).
 
 
 12
 Fugazy asserts that the memorandum on which the Board relied did not apply to the Queens Village location. The company's own testimony in support of this claim is ambiguous at best. The company official who promulgated the memo, which was addressed to "all employees" and which, on its face, appears unambiguously to establish a definite company-wide policy with respect to vacation benefits, testified that the memo was distributed to employees at the Queens Village location. J.A. 474. We therefore uphold the Board's findings and conclusions with respect to the discriminatory denial of vacation benefits.
 
 IV. REFUSAL TO BARGAIN
 
 13
 Once the Board concluded that Ganser's was merely Fugazy's alter ego, it properly found that Fugazy was obligated to recognize and bargain with the Union over the terms and conditions of employment of the service shop employees as of the Union's victory in the May 31 election and that Fugazy had engaged in a bad faith effort to evade that duty. We find no merit in Fugazy's challenges to this determination. Fugazy contends that it was not obligated to bargain with the Union--indeed, that section 8(a)(2) prohibited it from doing so--until ballot challenges were resolved and the Union's election victory was certified by the Board on December 16, 1982. Yet the Board has long held that an employer acts at its peril in refusing to bargain and in making unilateral changes in the terms and conditions of employment, as Fugazy did, during the period before certification in which challenges to the validity of an election are pending. In these circumstances, the Board will find a violation of section 8(a)(5), as it did here, where its resolution of the ballot challenges results in certification. See, e.g., NLRB v. W.R. Grace & Co., 571 F.2d 279, 282 (5th Cir.1978); Laney & Duke Storage Warehouse Co., 369 F.2d 859, 866 (5th Cir.1966); Injected Rubber Products Corp., 258 NLRB 687, 696 (1981). If Fugazy's argument were accepted, employers could easily postpone their obligation to bargain for months or years either by filing spurious objections to the election or by provoking valid union challenges by themselves engaging in objectionable conduct or, as in this case, by insisting on the voting eligibility of indisputably ineligible personnel. The Board has properly avoided this unacceptable result.
 
 
 14
 Nor is there merit in Fugazy's contention that it had no duty to bargain in the absence of a request for bargaining by the Union. The Union's victory in a valid election, even where its results have been challenged and are not yet certified, creates an obligation to bargain independent of any request for bargaining. See Injected Rubber Products Corp., 258 NLRB at 296-97; Laney & Duke Storage Warehouse Co., Inc., 151 NLRB 248, 266-67 (1965), enf'd in relevant part, 369 F.2d 859. In any event, Fugazy's assertion that its refusal to recognize and bargain with the Union was motivated by the existence of pending challenges to the election or the absence of a demand for recognition is flatly contradicted by the Board's determination, which we find to be supported by substantial evidence, that Fugazy acted in bad faith in evading its duty under the Act and refusing to deal with the Union. We therefore uphold the Board's finding of a violation of the duty to bargain under section 8(a)(5).
 
 
 15
 We find the Board's conclusions with respect to the contested issues of alter ego status, discriminatory denial of vacation benefits, and the refusal to bargain to be reasonable and supported by substantial evidence in the record. Fugazy's petition for review is therefore denied and the Board's cross-petition for enforcement is granted.
 
 
 16
 So ordered.
 
 
 
 [1]
 The Board's decision [hereinafter cited as "NLRB"] is reprinted in part at 112 LRRM 1203; page citations to that reporter are provided when possible. For portions of the Board's decision not reprinted and for the ALJ decision [hereinafter cited as "ALJ"], page citations to the Joint Appendix (J.A.) are provided
 
 
 [2]
 The Board also cited Elite Services, Inc., a New York corporation whose ownership, officers, directors and operators are identical with those of Fugazy, a Delaware corporation, and which was therefore stipulated by the parties and found by the ALJ to be a "joint employer" with Fugazy. ALJ, J.A. 22 n. 1
 
 
 [3]
 Id. at 22
 
 
 [4]
 NLRB, 112 LRRM at 1204-05
 
 
 [5]
 The revised tally of ballots showed ten votes for Local 355, one vote for Local 819 of the Teamsters, six ballots as to which union challenges were later sustained, and three non-determinative ballots. Id. Thus, of the eleven valid ballots cast, Local 355 received ten votes. The six challenged ballots were cast by supervisors Ganser, Marra, Rizzo, and Austin and vice presidents Harkowa and Fugazy, all clearly ineligible to vote. ALJ, J.A. 24. But because Local 355 did not receive a majority of the ballots actually cast, the results of the election were not certified until the Board's decision on December 16, 1982. NLRB, 112 LRRM at 1204
 
 
 [6]
 Id. at 1205
 
 
 [7]
 Id. at 1204-05
 
 
 [8]
 Id. at 1205
 
 
 [9]
 Id
 
 
 [10]
 Id
 
 
 [11]
 ALJ, J.A. 31
 
 
 [12]
 NLRB, 112 LRRM at 1205
 
 
 [13]
 Fugazy argues that the Board's alter ego decision was merely an attempt to circumvent the Supreme Court's decision in First Nat'l Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981) (no duty to bargain over economically motivated partial closing decision), which reversed the Board's doctrine in Ozark Trailers, Inc., 161 NLRB 561 (1966), on which the ALJ had relied in ordering Fugazy to bargain over the decision to shut down its repair operations. We see no foundation for this charge and adhere to our conclusion upholding the Board. Nor is there any merit in Fugazy's reliance on Textile Workers v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), which concerns the extent to which complete and partial closings may or may not violate section 8(a)(3), and has no application in the case of an apparent shutdown and sale of operations that is found to be a sham, creating merely a "disguised continuance."
 
 
 [14]
 ALJ, J.A. 29 n. 14, 30