## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## IDAB, INC., Respondent.

No. 85–5532.

United States Court of Appeals,
Eleventh Circuit.

Sept. 10, 1985.

---

Robert T. Kofman, Mershon, Sawyer, Johnston, Dunwody & Cole, Roderick V. Hannah, Miami, Fla., for respondent.

William M. Bernstein, L. Pat Wynns, N.L.R.B., Washington, D.C., for petitioner.

Before KRAVITCH and HATCHETT, Circuit Judges, and THOMAS *, District Judge.

KRAVITCH, Circuit Judge:

The National Labor Relations Board (the Board) petitions for enforcement of a Board order directing IDAB, Inc. (the Company) [1] to recognize and bargain with the International Association of Machinists and

---

* Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. At the time of the election which forms the basis of this case, the Company's name was EDS–IDAB, Inc. Subsequently, the name was changed to IDAB, Inc.

Aerospace Workers (the Union). The Company has refused to bargain with the Union because it claims that the Union engaged in actual and threatened violence prior to, and impermissible campaigning during, a representation election, and that the election must be set aside for those reasons. The Company argues that the Board's findings that such actions did not take place are not based upon substantial evidence, and that the handling of this case by the Administrative Law Judge (ALJ) and the Board resulted in a denial of due process. Finding these claims without merit, we enforce the Board's order in full.

## I. BACKGROUND

On November 1, 1979, the Board conducted an election among the Company's employees. The result was 44 votes for the Union, 37 against, and 2 challenged ballots.[2] The Company filed timely objections to the election, claiming that the Union had denied employees free choice in the election because of acts of violence, threats of violence, and improper electioneering by the Union and pro-Union employees. The Company alleged that this conduct created a general atmosphere of fear and reprisal rendering a free expression of choice impossible, and that it had a material effect on the outcome of the election. The Regional Director for the Board conducted an ex parte investigation of the matter and concluded that the Company's objections were without merit. The Board agreed and certified the Union as the exclusive bargaining representative for the employees in the unit.

In order to secure judicial review of the Union's alleged misconduct during the election, the Company refused to bargain with the Union. The Union brought an unfair labor practice (ULP) charge alleging that the Company had violated section 8(a)(1)

and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), by refusing to recognize and bargain with the Union. The General Counsel issued a refusal to bargain ULP complaint and moved for summary judgment. The Board granted the General Counsel's motion for summary judgment and ordered the Company to recognize and bargain with the Union. *EDS–IDAB, Inc.*, 251 N.L.R.B. 19 (1980). The Company sought review of the Board's order in the former Fifth Circuit. The court denied enforcement of the order, holding that the Company was entitled to an evidentiary hearing on its allegations of Union misconduct. Thus, the matter was remanded for a hearing. *EDS–IDAB, Inc. v. NLRB*, 666 F.2d 971 (5th Cir. Unit B 1982).[3]

A hearing was held before an ALJ on July 14, 15, 16, and September 7 and 8, 1982. The ALJ determined that the Company's objections were without merit and recommended that the Board reaffirm its earlier order. The Company again filed timely objections. The Board affirmed the decision of the ALJ and ordered the Company to cease and desist from refusing to bargain with the Union and from interfering, in any like or related manner, with employees' expression of their statutory rights, and to post copies of an appropriate remedial notice. *IDAB, Inc.*, 269 N.L.R.B. 100 (1984). The Board then petitioned this court for enforcement of its order.

Much of this case hinges on disputed facts concerning pro-Union employees' actions prior to and during the election. The Company gives the following version of the events of this period:

The Union established an in-house organizing committee consisting of employees Victor Ugarte, Al Gonzalez, Luis Jorge, and Francisco Rodriguez. These employees met each week with the Union organiz-

---

2. No action was taken with respect to the two challenged ballots because they were insufficient in number to affect the outcome of the election.

3. The court found that the Company had presented specific evidence that raised substan-

tial and material issues of fact as to whether the threats, violence, and impermissible electioneering were sufficient to destroy the atmosphere necessary for the exercise of free choice during the election.

er, Tony Klinakas, and were regarded by the other employees as the leading Union organizers. Approximately one week before the election, Rodriguez threatened pro-Company employee Contreras with a gun which he carried underneath his shirt. Contreras testified that Rodriguez told him that he had to vote for the Union, and that if he did not he knew "what to expect." In addition, Jorge punched Contreras in the eye. During the campaign, tires of two pro-Company employees, Wilk and Cincentes, were vandalized.[4] Prior to the election, Jorge twice threatened to "break up" employee Leon's car if he did not vote for the Union. Employees Freyre and Alemany also were threatened.[5] Rumors of violence or threats of violence by pro-Union employees were widely circulated. Employees Freyre, Wilk, Jorge, and Gonzalez, and managers Medina and Hall, testified about these rumors.

The Company further claims that on the day of the election, numerous incidents of improper electioneering took place. Gonzalez, the Union observer, wore a two-inch button saying "Vote Yes for IAM" on his lapel during the election. Jorge wore overalls with a Union emblem on both front and back. He spent a long time in the vicinity of the polls and spoke with other employees while waiting in line. After he voted, he lingered outside the building where the voting was taking place, positioning himself so that employees going to vote would have to walk near him. In addition, during the first of two voting periods, the Union organizer, Klinakas, remained in the parking lot where employees going to vote would have to pass by him.

There was conflicting testimony on each of these alleged events, and the ALJ made the following factual findings, as affirmed by the Board:

The alleged gun incident never took place. The ALJ credited Rodriguez' denial of the event and found the testimony regarding the incident inconsistent, contradictory, and inherently improbable. Both Jorge and Contreras denied that Jorge intentionally punched Contreras, claiming that the black eye was caused accidentally. The evidence also failed to establish that this incident took place before the election. Ugarte's testimony that he heard Jorge threaten Contreras was contradicted by Contreras himself. The other allegations of threats were also discounted. Key recipients of alleged threats either did not testify or denied being threatened. Others stated that they did not take the threats seriously. Any rumors regarding alleged violent acts or threats were not circulated until after the election. Finally, the ALJ determined that Ugarte, who testified on behalf of the Company, had attempted to influence other employees to give pro-Company testimony at the hearing in exchange for promised benefits, and that the Company had a "proclivity" to attempt to influence testimony. The ALJ concluded:

> The most that may be made out by the evidence of pre-election events is that Jorge may have made joking references about damage to Leon's car, that Gonzalez may possibly have joked with Freyre in a manner which the latter considered to be vaguely threatening, and that Wilk may have found a spike in his tire without knowing the source.[6]

The ALJ further found that the basic unreliability of the witnesses put even these events into question, but that, even if they did take place, they did not warrant setting aside the election.

Regarding the impermissible electioneering charges, the ALJ found that Jorge cast his ballot in a normal manner and then left the voting area, pausing for only five to ten

---

**4.** Employee Freyre's tires were vandalized after the election.

**5.** The Company states that it no longer relies on Contreras' black eye or the alleged threats to Alemany to support its position.

**6.** The Board noted that there was uncontradicted testimony that two employees suffered tire damage before the election, but found it unnecessary to determine if the damage actually occurred because there was no evidence linking it with the election.

minutes outside the building to wait for a friend, and that the Union organizer did not stay in the parking lot while the employees were voting. The ALJ concluded that neither Gonzalez' button nor Jorge's patches required setting aside the election.

The Board adopted the ALJ's conclusions, explicitly stating that it did so without relying on the ALJ's findings regarding a "proclivity" on the part of the Company to attempt to influence the testimony of the witnesses. The Board also discredited employee Mures' testimony because the ALJ had erroneously referred to him as female and because the ALJ incorrectly stated that he was a current employee of the Company at the time of the hearing.

## II.  DENIAL OF DUE PROCESS

On July 14, 1982, the day the ALJ began the hearing on the Company's objections to the election, the Union filed a new ULP charge, alleging that the Company had attempted to influence the testimony of potential witnesses at the hearing.[7] The ALJ determined that this collateral ULP could not be decided at the hearing, but did allow Union counsel to cross-examine Ugarte about issues relevant to the collateral ULP such as meetings where Ugarte allegedly attempted to solicit pro-Company testimony. The ALJ, however, limited questioning to the extent that it went to Ugarte's credibility. On August 31, 1982, during a recess between the third and fourth days of the hearing, the Regional Director approved a withdrawal of the new ULP charge. When the ALJ reconvened the hearing, Gonzalez was allowed to testify about the alleged meetings for the purpose of determining

Ugarte's credibility. Company president Kipp, an alleged participant at two of these meetings, did not testify. The court credited Gonzalez' account of these meetings including his allegation that Ugarte and Kipp had attempted to influence testimony in exchange for job guarantees.[8] The ALJ concluded that Ugarte was an unreliable witness and that his testimony was "a mixture of improbabilities, contradictions, and historical fictions," detailing his reasons for reaching this conclusion.[9] The ALJ further found

> Kipp's appearance at the Miami Lakes meeting, his acknowledgement that he would help Ugarte with jobs and other matters, and his suggestion that he might give job guarantees to employees in return for favorable testimony, provided that he did not leave himself "open," are indications of a proclivity on the part of Respondent to attempt to influence the testimony of witnesses in this proceeding. This proclivity must be considered in making credibility resolutions on the substantive issues.

The Company objected to these findings before the Board. The Board, in accepting the ALJ's factual conclusions, determined that

> the judge's finding of a "proclivity" on the part of the Respondent to attempt to influence the testimony of the witnesses in this proceeding, though possibly relevant in some respects, is not an essential element of his credibility findings and we do not rely on it in that regard. An exception in this respect concerns employee Ugarte, since the evidence regard-

---

**7.**  This ULP complaint also alleged that Gonzalez had been discriminatorily discharged.

**8.**  Gonzalez testified that Ugarte had urged the employees to "get together ... so that everything looks all right" and that they should "collaborate" with the Company, which might guarantee their jobs in return. He further testified that Kipp had said that Ugarte was "working with" the Company and that the Company had promised to help him with jobs and other matters, such as staying in the country. Ugarte's version of the meetings was quite different. He said Rodriguez and Jorge were "repentant," be-

cause they had "asked for money to leave the Union," and that they were willing to tell the truth in return for promises of job security.

**9.**  For example, the ALJ found "highly improbable" Ugarte's claim that Gonzalez, Jorge, and Rodriguez had tried to obtain money in return for abandonment of the Union soon after the election victory, or that they were "repentant" at having made such an attempt. The ALJ also pointed out inconsistencies in Ugarte's testimony such as his testimony as to whether he could arrange a meeting with Kipp.

ing his attempted manipulation of witnesses prior to the hearing logically and properly was considered by the judge in evaluating his testimony.

The Company claims that the ALJ, in essence, decided the collateral ULP against the Company, then discredited all of the Company's witnesses based upon the finding of a "proclivity" to influence testimony. Moreover, the Company alleges that, in reliance upon the ALJ's assurances that the collateral ULP would not be decided, it chose not to rebut the innuendos raised by the Union. The ALJ then drew a negative inference from the fact that Kipp did not testify. The Company argues that due process requires that a party must either be notified of an ULP claim through the pleadings or be given an opportunity to fully and fairly litigate the ULP at the hearing, neither of which occurred here.

■■■ The Board asserts that the collateral ULP was not decided by the ALJ, and thus there was no due process violation. We agree. The ALJ used testimony regarding the alleged meetings to evaluate credibility;[10] he did not decide that these actions constituted an ULP and he did not apply sanctions for such violations. We also agree with the Board that the finding regarding the Company's "proclivity" is not an essential element of the ALJ's findings. The Company claims that the "proclivity" finding made up the core of the ALJ's credibility findings and stresses that "[t]he ALJ repeatedly referred to the Company's 'proclivity' to influence witnesses in discrediting Company testimony." The ALJ's opinion, however, only employs this phrase twice—once, as discussed above, and a second time in regard to why Contreras may have been reluctant to testify about the alleged gun incident. The Company had claimed that Contreras was in fear of pro-Union employees. The ALJ

found that Contreras could well have been reluctant to testify because he was fearful of committing perjury or "[g]iven the Employer's established propensity to attempt to influence testimony in this proceeding, it is at least equally plausible that Contreras was a hesitant witness because the Employer was attempting to influence him to testify to something that was not so." Thus, the ALJ was merely discounting the Company's explanation for Contreras' hesitancy. Moreover, as discussed in detail *infra*, the allegation of a gun threat was independently refuted by the implausible and inconsistent testimony about the incident.[11] Thus, we find that no denial of due process resulted from the ALJ's reference to the Company's "proclivity" to influence testimony.

### III. ATMOSPHERE OF FEAR AND COERCION

■■■ Appellant urges us not to accept the ALJ's credibility resolutions as modified and adopted by the Board. We are bound by the Board's factual determinations if they are supported by substantial evidence in the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Where the evidence is conflicting and the Board's determination rests on credibility choices, "we are bound by the credibility determinations of the Board unless they are inherently unreasonable or self-contradictory." *Mead Corp. v. NLRB*, 697 F.2d 1013, 1022 (11th Cir.1983). We are, however, " 'not compelled to respect' credibility choices 'based on inadequate reasons or no reasons at all.' " *ONA Corp. v. NLRB*, 729 F.2d 713, 719 (11th Cir.1984), citing *NLRB v. Moore Business Forms, Inc.*, 574

---

**10.** The ALJ was entitled to discount Ugarte's testimony based upon a finding that he had tried to influence testimony and had a motive for doing so.

**11.** The Company also claims that the testimony of Medina and Wilk was discredited merely because they were found to have pro-Company

sympathies. The ALJ's opinion does not state this. Rather, the ALJ found that their testimony was in conflict with the preponderance of the evidence and that Medina gave exaggerated testimony. A witness' bias can, of course, be taken into account in determining credibility.

F.2d 835, 843 (5th Cir.1978).[12] In the present case, the Company contends that there is no substantial evidence supporting the Board's determinations.[13] We disagree. Although the record is fraught with conflicting testimony, and called for numerous credibility judgments, the ALJ's assessment of this testimony is neither unreasonable nor contradictory and is supported by adequate reasons. The Board accepted most of these factual determinations.[14]

We need not discuss each of the ALJ's factual findings in detail. A review of these findings shows that they are specific and based upon substantial evidence in the record, and thus, should not be disturbed by this court. For example, the ALJ discussed at great length why he found that the alleged gun threat by Rodriguez never took place. The Company witnesses' testimony about the incident was filled with inconsistencies concerning the time and place of the incident.[15] The ALJ noted the implausibility of the way both Contreras and the Company handled the incident. Contreras did not report the alleged incident until several hours later. The Company took no immediate action against Rodri-

guez, despite the testimony that having a gun on Company property was grounds for immediate dismissal. The police were not called. In a subsequent written reprimand of Rodriguez for alleged threats, the incident was not mentioned, nor was it mentioned in the Company's original objections to the election. Regarding the alleged punching of Contreras by Jorge, the ALJ chose to discredit the testimony of the Company Regional Sales Manager Medina[16] in favor of the testimony of both Jorge and Contreras who testified that the black eye was caused accidentally. The ALJ also noted that the Company had failed to establish that the incident took place before the election. The ALJ set out in detail why he concluded that employee Freyre had not been threatened, including the fact that Freyre himself denied any serious threats and that, although Vigil had reported these threats in a pre-hearing affidavit, the Company did not question Vigil on the matter at the hearing.[17] The ALJ further found that Alemany denied being threatened in his affidavit, and that although Leon testified that his tires were slashed, this testimony was contradicted by his pretrial statement.[18] We cannot say

---

**12.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**13.** One of the Company's main contentions is that the ALJ discredited all of the Company's witnesses based upon its finding that the Company had a "proclivity" to influence witnesses, an issue which we dealt with in section II.

**14.** The Board did not rely upon the ALJ's "proclivity" finding and discredited the testimony of Mures, as discussed *supra.* The Board, however, found that Mures' testimony was not necessary, as each fact that he testified to was independently corroborated by other evidence. *See infra* n. 25. The Board further found it unnecessary to rely upon the ALJ's comments that Wilk would be an unlikely target of threats because of his physical attributes. Finally, the Board rejected Gonzalez' testimony that he heard rumors about the gun incident before the election as contrary to the weight of the evidence.

**15.** The Company's only eye witness was Ugarte. Ugarte's credibility was discredited by his at-

tempt to influence testimony about the gun threat. His testimony was further undermined by his statement that he heard Rodriguez threaten Contreras at other times, an allegation that Contreras denied. The Company admits to "minor inconsistencies" in its witnesses' testimony, but argues that this is due to the passage of time and, further, that "[i]f the Employer had, as the ALJ repeatedly alleges, contrived a plan to adduce manufactured testimony, it certainly would have done a better job of having its witnesses testify in a consistent pattern."

**16.** Medina testified that another employee told him that Jorge had punched Contreras, thus he had no direct knowledge of the incident.

**17.** Freyre's tire was deflated, but only after the election, thus it could not have affected the election.

**18.** The ALJ also found that Leon did not feel seriously threatened, based upon his pretrial statement.

that the ALJ erred in considering inconsistencies or in crediting earlier statements over testimony. Finally, the ALJ found that Wilk did find a spike in his tire, but that the source of it was not established.[19]

The ALJ found that there were some rumors of threats or acts of violence, but that they were not widespread because so many employees denied hearing them. Moreover, the ALJ determined that the rumors began circulating only after the date of the election and, as such, could not have influenced the employees' free choice in the election. As evidence of this timing, the ALJ discussed the alleged gun threat incident and noted that the testimony of witnesses Almeida and Hall, as well as the Company's handling of the alleged incident, corroborated a finding that no rumors of a gun incident circulated until after the election. The strongest evidence of pre-election rumors came from Medina and Wilk, whose testimony the ALJ did not find credible.

The Company argues that under the Board's rigid standard for conduct during a representation election, the election must be set aside if its version of the facts is accepted. Because we have found that the Board's factual findings are entitled to deference, we consider only whether, under those facts, the election must be invalidated. Thus, we must determine if several joking threats, and damage to two employees' tires, merit setting aside the election.

■■■ Under the Board standard, established in *General Shoe Corp.*, 77 N.L.R.B. 124 (1978), conditions must exist during the campaign so that employees are given "a free and untrammeled choice for or against a bargaining representative." *Id.* at 126. *See Hometown Foods, Inc. v. NLRB*, 416 F.2d 392 (5th Cir.1969). In assessing whether there was an atmosphere of fear and coercion which deprived the employees of this choice, this court uses a three-part test: "(1) whether the evidence establishes fear in the minds of the voters; (2) whether

that fear affected their votes; and (3) whether, had it not been for the fear, the results of the election might have been different." *Certainteed Corp. v. NLRB*, 714 F.2d 1042, 1060 (11th Cir.1983). The party objecting to the election "must prove by specific evidence that the election results did not reflect the unimpeded choice of the employees." *Id.* Because of its expertise, the Board has broad discretion in conducting elections and resolving representation matters. *Id.* at 1047; *Daylight Grocery Co. v. NLRB*, 678 F.2d 905, 909 (11th Cir.1982). There is a presumption that ballots cast under the specific safeguards provided by the Board's procedures reflect the true desires of the employees. *NLRB v. Zelrich*, 344 F.2d 1011, 1015 (5th Cir.1965).

■ Bearing in mind the Company's heavy burden in this case, we look to the credited evidence of pre-election misconduct. As the ALJ pointed out, isolated, innocuous, and joking remarks not shown to have caused a change in an employee's vote are insufficient to set aside an election. "The decisive factor ... is not whether improprieties occurred during the campaign, but rather whether the challenged conduct produced such a climate of tension and coercion that the employees were effectively precluded from making a free choice." *NLRB v. White Knight Manufacturing Co.*, 474 F.2d 1064, 1067 (5th Cir. 1973). *See also NLRB v. Gulf States Canners, Inc.*, 634 F.2d 215 (5th Cir. Unit A), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981) (simple showing of misconduct alone is not sufficient to overturn an election; the employer must show that the actions interfered with employees' exercise of free choice to such an extent that they materially affected the results of the election). Nor is anonymous property damage enough to warrant a new election. As the former Fifth Circuit stated in *Bush Hog, Inc. v. NLRB*, 420 F.2d 1266 (5th Cir.1969):

---

19. The Board also found that there was evidence that Cincentes suffered tire damage. *See*    *supra* n. 6.

We think it is clear that conduct not attributable to the opposing party cannot be relied upon to set aside an election. The only exception to this general principle, not applicable here, is where coercive and disruptive conduct or other action is so aggravated that a free expression of choice of representation is impossible. Any other rule would invite third parties or one of the protagonists who doubted the election outcome to anonymously create incidents and then attempt to use them to set aside the election.

*Id.* at 1269. *See also Amalgamated Clothing and Textile Workers Union v. NLRB,* 736 F.2d 1559, 1567–68 (D.C.Cir.1984); *Daylight Grocery Co.,* 678 F.2d at 909 (anonymous threats must be carefully weighed; only when such threats result in creating an atmosphere of confusion and fear of reprisal among voting employees should the election be overturned). Thus, we conclude that the Board was justified in finding no effect on free choice by the few acts which may have occurred before the election.[20]

## IV.  IMPROPER ELECTIONEERING

The ALJ made similarly detailed findings regarding the alleged improper electioneering. The ALJ credited Jorge's testimony that he did not sit on boxes near the election table and this testimony was corroborated by Hall. Gonzalez corroborated Jorge's testimony that he did not linger in the election area. Medina's contrary testimony was rejected because he was found to be an unreliable witness.[21] Thus, the ALJ determined that Jorge did not impermissibly linger at or near the voting area. The ALJ also found that Klinakas did not remain in the parking lot during the election and that he only spoke with employees who had already voted. Klinakas' testimony was credited because of its detailed nature as opposed to the contrary testimony of Green, a former vice president of the Company. The ALJ also chose to credit the Union's version of what took place during the election because of the lack of objections by the Company agent during the voting.[22] The only possibly improper electioneering the ALJ found was that Jorge wore two Union emblems on his overalls with writing so small that it would have been very difficult to read,[23] and that Gonzalez wore a Union button saying "Vote Yes for IAM."[24] The Board accepted the ALJ's findings with the exception of the references to Mures' testimony.[25] We find that these credibility determinations are supported by substantial evidence, and thus we will not disturb them.

The prior opinion of the former Fifth Circuit in this case sets the standard for evaluating the Company's charge of improper electioneering. The court stated:

An election will be set aside where representatives of any party to an election engaged in "prolonged" conversations with voters waiting to cast their

---

20. This is so even though this was a close election subject to heightened scrutiny. *See NLRB v. Gooch Packing Co.,* 457 F.2d 361, 362 (5th Cir.1972).

21. The ALJ also noted the vague and contradictory nature of the other Company witnesses, and that the testimony of Wilk and Chung tended to corroborate Jorge.

22. Gonzalez, the Union representative, complained to the Board agent during the election about the presence of representatives of the Company in the election area and the agent caused them to leave.

23. The letters "A of M" were about three-eighths of an inch in height and the full name of the Union was written in a circle around the border

of the emblem in letters approximately one-fourth of an inch in height.

24. Gonzalez was not asked to remove the button during the election. The Company observer, however, refrained from signing a certificate stating that the balloting during the second session was fairly conducted on advice of the Company attorney who had learned about the button.

25. The Board found that disregarding Mures' testimony did not undermine the ALJ's findings as his testimony was only used as corroboration for the testimony of Klinakas, Jorge and Gonzalez, and because the Company's witnesses gave confusing and conflicting testimony which failed to establish objectionable conduct even when considered standing alone.

ballots, regardless of the content of such conversations. *NLRB v. Carroll Contracting & Ready-Mix, Inc.*, 636 F.2d 111, 113 (5th Cir.1981); *Michem, Inc.*, 170 NLRB 362 (1968). However, where the improper conduct is not that of agents of one of the parties, then such conduct will warrant setting aside an election if the acts disrupt the voting procedure or destroy the atmosphere necessary to the exercise of a free choice in the election. *NLRB v. Carroll Contracting & Ready-Mix, Inc.*, 636 F.2d at 113.

666 F.2d at 975. The purpose of the *Michem* rule is to protect the "final minutes before an employee casts his vote...." 170 N.L.R.B. at 362. However, "the Board has not allowed the so-called 'per se' *Michem* rule to invalidate elections wholesale." *Certainteed Corp.*, 714 F.2d at 1061. In *Carroll Contracting & Ready-Mix, Inc.*, the court set aside an election where two former Carroll employees wore "Vote Teamsters" signs on their hats, and an enlarged reproduction of the ballot with a "X" marked in the "Yes" box pinned to their shirts. These employees stood in the parking lot where employees were waiting in line to vote. As the voters passed them, the two former employees "urged the employees to vote for the union and repeatedly gestured to the 'Yes' box on the ballot pinned to their shirt." 636 F.2d at 112–13. This conduct was objected to prior to the start of the election. *Id.*

In the present case, the two incidents, the Union observer wearing a Union button, and another employee wearing two Union patches and standing outside the voting area for five to ten minutes, do not constitute objectionable electioneering sufficient to set aside an election.[26] Contrary to the Company's assertion, Jorge was not acting as a "human billboard." He was only wearing his customary clothing which included two Union patches. Unlike the employees in *Carroll*, Jorge did not position himself outside of the polling place during the election; he was there only five to ten minutes waiting for a friend. In addition, unlike the employees in *Carroll*, Jorge did not orally urge voters to support the Union or gesture towards the Union patch on his overalls.[27] The former Fifth Circuit pointed out, Gonzalez wearing the Union button, "considered in isolation, will not ordinarily be sufficient to invalidate an election, *NLRB v. Laney & Duke Storage Warehouse Co.*, 369 F.2d 859, 864–65 (5th Cir.1966)." 666 F.2d at 976 n. 6. As in *Laney*, the Union observer here wore the button without objection during the voting.[28] In addition, Klinakas' conversations with employees *after* they voted do not constitute objectionable activity as this conduct could not have intruded upon "the final minutes" before the employees cast their votes. We conclude that none of these actions, considered either individually or cumulatively, warrant setting aside the election.

■■■ When the former Fifth Circuit considered this case previously, it stressed that the alleged objectionable electioneering should be considered cumulatively with the alleged threats and violence in order to determine whether the election should be set aside. As already discussed, here we must uphold the Board's findings concern-

---

**26.** These actions are insufficient to set aside the election regardless of whether the employees involved are considered agents of the Union. Thus, we agree with the Board that it is unnecessary to consider whether the members of the in-plant organizing committee acted as agents of the Union.

**27.** The Company admits that there is no evidence that Jorge orally urged voters to support the Union.

**28.** *Laney* involved a Union observer wearing a red, white and blue button with stars on it, which was one and three-eighths inches in diameter and bore the inscription "Vote USA." The Company objected to the wearing of the pro-Union button and to the fact that the particular button was coercive because the Union's initials, being the same as those of the United States of America, implied that the Union had government approval. The Board rejected these objections and the Fifth Circuit affirmed, noting that judicial review "is limited to ascertaining whether the Board's determination is within reasonable bounds." 369 F.2d at 864.

ing the allegations of a pre-election atmosphere of fear and coercion. We conclude that limited findings of threats and violence, considered cumulatively with the limited findings of objectionable electioneering, require us to uphold the Board's decision not to set aside the election.

We therefore conclude that the Board's order is entitled to ENFORCEMENT in full.

DANIEL HOLCOMBE THOMAS, District Judge, sitting by designation, specially concurring:

Although concurring in the result, I comment briefly to make clear that, for me, this result is required only in that the record reaches the minimum requirements necessary to be upheld. It is clear that the record would not justify a holding that the Administrative Law Judge's and the Board's findings were "inherently unreasonable or self contradictory."

I do, however, question the findings made by the Administrative Law Judge and the Board. The initial finding by the Administrative Law Judge that the employer established a propensity or proclivity to attempt to influence testimony in the proceeding appears to permeate not only the Administrative Law Judge's subsequent findings but those of the Board as well, notwithstanding the Board's statement that such proclivity was not an essential element of the Administrative Law Judge's credibility findings and was not relied upon by the Board in that regard. I find it extraordinary that all credibility choices were made against company employees.