[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 05, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-12884

_____

NLRB No. 10-CA-32902

ASSOCIATED RUBBER COMPANY,

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner,

UNITED STEELWORKERS OF AMERICA,
AFL-CIO-CLC,

Respondents-Intervenors.

_____

Petition for Review and Cross-Application for Enforcement of an Order of the
National Labor Relations Board

_____

**(July 5, 2002)**

Before EDMONDSON, Chief Judge, CARNES and SILER[*], Circuit Judges.

CARNES, Circuit Judge:

An employee of Associated Rubber Company was threatened and subjected to greater risk of physical injury on the job because of his opposition to the union, and  news of that happening was disseminated among a number of employees.  The issue is whether that misconduct invalidates the results of  the close vote in favor of the union in the certification election which occurred shortly thereafter.  In a split decision  the National Labor Relations Board concluded that the election was not tainted and certified the union, the United Steelworkers of America, AFL-CIO-CLC, as the collective-bargaining representative of an appropriate unit of Associated Rubber's employees.  When Associated Rubber thereafter refused to bargain with the newly certified union, the Board ordered it to do so.  Associated Rubber has appealed that order, and the Board has cross-appealed asking us to enforce the order.  For reasons we will discuss, we set aside the Board's order.

## I.  BACKGROUND

On June 14, 1999, the union filed a petition with the Board seeking certification as the collective bargaining representative of certain maintenance

---

[*] Honorable Eugene E. Siler, Jr., U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

workers, truck drivers, and mechanics employed at Associated Rubber's three plants in Tallapoosa, Georgia, where the company operates its rubber production facilities. A secret ballot election was held on July 23, 1999, and the union won by a vote of 53 to 50, with one non-determinative challenged ballot. Associated Rubber, however, timely filed objections to the election, alleging that certain pro-union employees had unlawfully interfered with the election by, among other things, threatening personal harm and property damage to employee voters who did not support the union in the election.

The Board ordered a hearing on Associated Rubber's objections. At the hearing there was evidence of numerous incidents of objectionable conduct on the part of some of Associated Rubber's pro-union employees, occurring both before and after the filing of the election petition, as well as on the day of the election itself. Among other things, there was evidence about what the parties refer to as the "Banbury mixer incident."

## A.

A Banbury mixer is a piece of machinery used to custom mix rubber products. Raw materials, by formula, go into it at a rate controlled by the operator. When the materials reach a prescribed high temperature, the mixing is complete and the mixer automatically releases the resulting compound as one hot, large 450-

3

pound batch, which falls eight to ten feet below to a lower level where there is a mill.[1] There, the mill operator maneuvers the batch through two rollers until the material is worked into a pliable sheet of rubber.

Each batch of compound that comes out of the Banbury mixer has a prescribed cycle time which is based on how the compound was handled in the past. The cycle time is the total of the mix time, which is the time the raw materials are mixing in the mixer, and the "down time," which is the time the mill operator is maneuvering the batch through the rollers. The Banbury mixer operator and the mill operator know the prescribed cycle times for the different compounds. The Banbury mixer operator is responsible for timing the loading of the raw materials into the mixer to comport with the cycle times.

The operator of each Banbury mixer controls the rate at which materials flow into the corresponding mill operator's area, because the rate at which he puts raw materials into the mixer determines the rate at which the hot, 450-pound batches drop to the mill below. As a result, the Banbury mixer operator has the power to make life difficult or even dangerous for the mill operator who is on the receiving end of the output. The prescribed minimum cycle time is necessary to

---

[1]The production records for Banbury Mixer 1 show that the drop temperature of the compound during the incident was at or above 240 degrees Fahrenheit.

4

allow the mill operator to maneuver all 450 pounds of the scalding hot rubber batch through the rollers and into a pliable sheet of rubber before the next 450-pound batch falls.  If the Banbury mixer operator feeds the raw materials into the mixer at an accelerated pace, the output rate will increase so that the mill operator may not be able to maneuver the entire batch of rubber through the rollers before the next batch drops, thereby leaving him with leftover compound to work with in addition to the latest 450-pound batch.  If the cycle continues at an accelerated rate, the load can continue to back up on the mill operator, giving him less and less time to deal with more and more of the hot compound.  The danger the Banbury mixer operator can create for the mill operator stems from the fact that accelerating the cycle time leaves the mill operator with less and less time to deal with ever increasing amounts of  material.

The facts surrounding the Banbury mixer incident in this case are as follows.  Less than two weeks before the election, Tim Spears, the first shift mill operator in Plant 2 for Banbury mixer 1's  production line, showed his opposition to the union by refusing to accept some literature that a union supporter offered him. Leroy Brown, a union supporter and first shift operator for that  Banbury mixer, told Spears he had better accept the literature. When Spears declined, Brown told him that he would "pay" for it the next day.  Spears did not pay for it the next day, but

5

he did pay for it seven or eight days later – just three days before the union certification election.

On July 20, 1999, while Brown was operating Banbury mixer 1 and Spears was operating the mill below, Brown speeded up the rate at which the heavy, hot batches of compound were falling and had to be handled by Spears. The designated cycle time for the compound being produced is five minutes, and the customary cycle time for it ranges from five to six minutes.[2] Production records show, however, that between approximately 7:00 a.m. and 9:30 a.m. on July 20, over thirty batches were run, and more than twenty of those batches were run at less than the designated five minute cycle time, with the range for most of those cycles being from 4.1 to 4.6 minutes. Spears attempted to get Brown to slow down by repeatedly ringing a buzzer available for that purpose, but it did no good. Brown kept up the faster pace. At one point another employee, Tony Gerald (who happened to favor the union), had to come to Spears' aid and help him get the batches off the mill. The undisputed effect of Brown's malicious conduct over the two-and-a-half hour period was to make things difficult for Spears.

---

[2]Associated Rubber's production records show that the average cycle times for that compound in June, July, and August of 1999 were 5.56, 5.64, and 5.72 minutes, respectively.

When relieved that morning for his first break, Spears complained to the general shift foreman that Brown had been running the Banbury mixer "a lot faster than the [normal] cycle," which was "making his job extremely rough on him." Only after that complaint did the output from Brown's mixer slow down to the normal rate. Spears was sufficiently rattled by the incident to tell the foreman that if the union won the election, he would quit his job out of fear that the incident might reoccur.

It was no secret around the plant that Brown had threatened Spears for refusing to take union literature, and had then carried out the threat. Before the election other employees were aware of the threat and knew that Brown had speeded up the mixer to Spears' detriment. Spears himself told employee Larry Howard, and five or six employees, including Brown (but not Spears, of course), later talked and laughed about the incident in the break room. The election was held just three days after it happened.

B.

After a Board-ordered hearing, the hearing officer issued a report recommending that all of Associated Rubber's objections to the election be overruled and that the union be certified as the employees' bargaining representative. With regard to the Banbury incident, the hearing officer, with

7

considerable understatement, found that it was "evidently more serious than a harmless prank." However, in light of the fact that the incident was not of a sustained or repeated nature, and that a pro-union employee had eventually come to Spears' aid, the hearing officer concluded that Associated Rubber had not established that Brown's conduct tainted the election.

Associated Rubber filed with the Board exceptions to the hearing officer's recommendation and report. The Board adopted the officer's recommendation that the objections to the validity of the election be overruled and certified the union as the unit's exclusive collective-bargaining representative. With regard to the Banbury incident, while not doubting that it had happened, two members of the Board did not believe the incident was severe enough to justify invalidating the results of the election, believing instead that the incident and the dissemination of news about it did not affect the results.

The Board majority found, first, that Spears' affidavit had gotten the date of the incident wrong. His affidavit said that the Banbury incident occurred on July 13, but production records showed that the shortened cycles actually happened on July 20. Second, the majority noted that Spears had not actually sustained any physical injury as a result of the incident. Third, it said that the risk of injury to Spears had not been severe. Fourth, it found significant the fact that a pro-union

employee had come to Spears' aid. Fifth, it noted that as soon as Spears complained to a foreman the cycle time was slowed and the incident never reoccurred. Finally, although there was evidence that some employees, as the majority characterized it, "laughed about Brown 'getting them if they don't vote for the union,'" it saw no evidence that those employees viewed the Banbury incident as retaliation for Spears' rejection of union literature a week before.

The dissenting member of the Board thought that the Banbury incident warranted a new election. He pointed to the fact that the election was decided by only three votes, the fact that Spears had been put in danger and subjected to adverse working conditions and humiliation because of his refusal to take union literature, and the fact that news of it was disseminated to several employees.

## C.

In order to obtain judicial review of the allegedly objectionable conduct surrounding the union election, Associated Rubber refused to bargain with the union. The union then brought an unfair labor practice charge, and the General Counsel for the Board issued a complaint alleging that Associated Rubber had violated §§ 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5),[3] by refusing to bargain. When the General Counsel for the Board

---

[3]29 U.S.C. § 158(a)(5) states in relevant part: "It shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees, subject to

moved for summary judgment, the Board granted the motion and ordered

Associated Rubber to recognize and bargain with the union.  Associated Rubber

petitioned this Court for review, and the Board cross-applied for enforcement of its

order.  The union intervened.

## II.  DISCUSSION

On appeal, Associated Rubber contends that the coercive conduct

surrounding the Banbury incident made it impossible for employees to exercise

free choice in the election, and that Associated Rubber was therefore justified in

refusing to bargain with the union.[4]  Whether "a union representation election was

unfairly conducted and should be set aside is primarily a question for the [ ]

Board."  TRW-United Greenfield Div. v. N.L.R.B., 716 F.2d 1391, 1393 (11th Cir.

1983).  We need decide only whether the Board reasonably exercised its discretion

in rejecting  Associated Rubber's objections to the election.  Id.  We will not

overturn the Board's decision so long as its conclusion is supported by "substantial

evidence," viewing the record as a whole.  Cooper/T. Smith, Inc. v. N.L.R.B., 177

F.3d 1259, 1261 (11th Cir. 1999).  Moreover, where the evidence is conflicting and

_____

the provisions of 159(a) of this title."

[4]As we have mentioned, Associated Rubber also presented evidence of several other instances of allegedly objectionable conduct, which it contends impermissibly tainted the election.  Because we find that the Banbury mixer incident alone warrants setting aside the election, we need not address whether these other instances also contributed to an impermissibly tainted election atmosphere.

the Board's determination rests on credibility determinations, we are bound by those determinations unless they are "inherently unreasonable or self-contradictory." N.L.R.B. v. IDAB, Inc., 770 F.2d 991, 996 (11th Cir. 1985) (internal quotation marks and citation omitted). Recognizing the appropriate deference we afford the Board's decisions in such matters, we now consider whether the Board correctly evaluated the legal consequence of Brown's essentially undisputed conduct.

## A.

When the union itself engages in objectionable misconduct, the Board will overturn the election if the conduct "interfered with the employees' exercise of free choice to such an extent that [it] materially affected the results of the election." TRW-United Greenfield Div. v. N.L.R.B., 716 F.2d at 1393. If, however, a third party engages in misconduct, the party objecting to the election has the burden of showing that "the misconduct was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." Westwood Horizons Hotel, 270 N.L.R.B. 802, 803 (1984); Certainteed Corp. v. N.L.R.B., 714 F.2d 1042, 1060 (11th Cir. 1983). The question of whether an individual is acting as a union agent is a factual one, and any findings the Board makes regarding the agency relationship are afforded deference. Overnite Transp. Co. v. N.L.R.B., 104

11

F.3d 109, 113 (7th Cir. 1997).  The party asserting the agency relationship bears the burden of establishing it.  Millard Processing Servs., Inc. v. N.L.R.B., 2 F.3d 258, 262 (8th Cir. 1993). The Board found that Associated Rubber had failed to establish that Brown was an agent of the Union, and we will assume that finding is correct.

B.

Assuming Brown was not an agent of the union, the applicable standard is the one for third-party misconduct.  As we noted in M&M Supermarkets, Inc. v. N.L.R.B., 818 F.2d 1567, 1572 (11th Cir. 1987), we have phrased the standard for third party misconduct somewhat differently on occasion.  See, e.g., N.L.R.B. v. Heavy Lift, Inc., 607 F.2d 1121, 1123 (5th Cir. 1979) (stating that where "'conduct [is] not attributable to the opposing party [it] cannot be relied upon to set aside an election' unless it is so 'coercive and disruptive...that a free expression of choice of representation is impossible'" (citation omitted)); N.L.R.B.  v. Golden Age Beverage Co., 415 F.2d 26, 32 n.5 (5th Cir. 1969) (stating that misconduct, not attributable to the union, may "nevertheless warrant setting aside the election if it disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election").  No matter how the test is worded, it always stands for the same goal: "an ideal atmosphere in which a free

12

choice may be made by employees, protected from interference by employer, union, Board agent, or other parties." Home Town Foods, Inc. v. N.L.R.B., 416 F.2d 392, 396 (5th Cir. 1969).

The party objecting to the election has the burden of coming forward with specific evidence that this "ideal atmosphere" was destroyed to a sufficient extent that the results of the election should be set aside. See, e.g., N.L.R.B. v. IDAB, Inc., 770 F.2d 991, 998 (11th Cir. 1985). In determining whether the objecting party has met its burden, we have been guided by three factors: "(1) whether the evidence establishes fear in the minds of the voters; (2) whether that fear affected their votes; and (3) whether, had it not been for the fear, the results of the election might have been different." Id. at 998.

Where the objectionable conduct has both fallen short of threatening a sufficient degree of harm and has not had any demonstrated influence on the election, even where the union has won by a narrow margin, we have found that the challenging employer has not met the requisite burden of proof. See, e.g., IDAB, Inc., 770 F.2d at 993, 998-999 (even though union won by vote of 44 to 37, evidence of anonymous property damage and isolated, innocuous, and joking remarks not shown to have caused a change in an employee's vote were insufficient to set aside the election); Certainteed Corp. v. N.L.R.B., 714 F.2d

13

1042, 1046, 1060 (11th Cir. 1983) (where union won by a margin of 180 to 144 and an employee told two other employees that he would shoot them for voting for the union, but neither of the "threatened" employees took the threat seriously and explained that the employee who made the threat was always teasing, the challenging employer failed to meet its burden); Daylight Grocery Co., Inc. v. N.L.R.B., 678 F.2d 905, 907, 909 & n.5 (11th Cir. 1982) (where union won by vote of 47 to 46 and a third party made anonymous threats to employees the day before the election that "[they] had better vote for the Union," the challenging employer failed to make out a prima facie case in part because it could not show that the vote was influenced by the threats); N.L.R.B. v. White Knight Mfg. Co., 474 F.2d 1064, 1066,1067-68 (5th Cir. 1973) (where union won by margin of 92 to 85 and six out of 180 eligible voters were allegedly victimized, employer still could not meet the requisite burden because the incidents "amounted to nothing more serious than verbal excesses and isolated attempts to harass," and there was "no apparent indication that even any of these six were so intimidated that they were unable to vote their personal preferences in the election"); N.L.R.B. v. Monroe Auto Equip. Co., 470 F.2d 1329, 1332 (5th Cir. 1972) (refusing to presume that the unlawful activity had an impact on or interference with the employees' freedom of choice where the record showed that the effect of the

conduct was limited to specific employees, each of whom testified that he had voted his conscience and had ignored the unlawful conduct).

On the other hand, where the election has been close and where threats made during that election campaign have been shown to be both serious and to have affected employees' votes, we have denied enforcement of the Board's order compelling an employer to bargain with the newly certified union. See, e.g., N.L.R.B. v. Tampa Crown Distrib., Inc., 272 F.2d 470, 471-73 (5th Cir. 1959) (where union won by vote of 4 to 3 with one blank ballot cast and the evidence showed that two employees who received serious threats and/or coercion either changed their vote or cast a blank ballot as a result, the employer challenging the election met its burden). Even absent any evidence that votes were affected, where the election result was close and the threats or other verbal misconduct were sufficiently egregious, we have found that the challenging employer has met its burden even though there was no evidence that votes were changed. M&M Supermarkets, Inc., 818 F.2d at 1572-74 (where, in a unit of seventeen employees, union won by margin of 9 to 7 with two challenged ballots, a third party made remarks that were "so inflammatory and derogatory that they inflamed racial and religious tensions," and those remarks were made in front of three other employees, the "laboratory conditions" necessary for a free election were

15

destroyed).  Thus, while proof that particular votes were changed as a result of third-party misconduct can be highly relevant to the effect that misconduct has, such proof is not always required in order to overturn election results.   A fair reading of our decisions indicates that if  the misconduct is serious and the election results are close, proof of actual effect on votes is not required.

C.

Applying these legal standards to the record in this case convinces us that the Board's conclusion that the Banbury mixer incident did not warrant overturning the election should itself  be overturned.   To begin with, the record shows that Brown accelerated the mixer in retaliation for Spears' refusal to accept union literature.  Brown threatened to make Spears "pay" for refusing to accept union literature, and he did so.  Seven or eight days after the threat, and as the election drew near,  Brown accelerated the Banbury mixer during Spears' shift as mill operator, causing the hot 450-pound batches of rubber compound to drop at a faster rate, a rate that made things more difficult and more dangerous than would have been the case but for Brown's malicious behavior.  Spears was threatened because he failed to take union materials, and the threat was in fact carried out by the outspoken, pro-union employee who made it.

The Board majority, pointing to the time discrepancies between Spears' affidavit and the production records, suggested that Brown's acceleration of the machine was not in retaliation for Spears' refusal to accept union literature.[5] Spears affidavit asserted that he was threatened by Brown on July 12th, and that on the next day Brown caused the Banbury mixer to operate at an increased cycle time. Production records show that Brown increased the cycle time not on the 13th, but on the 20th, a week later. They also show that the increase was to a cycle time of 4.1 to 4.6 minutes per batch, not the 3 to 3 and ½ minutes per batch which Spears had estimated to another employee. Even discrediting Spears' affidavit and things he said about the timing of the incident and the degree the cycle time increased, the undisputed fact remains that Brown substantially increased the cycle

---

[5]Spears was subpoenaed but did not appear to testify, and Associated Rubber moved for the hearing officer to enforce the subpoena or, in the alternative, to accept into evidence the affidavit in its entirety. The hearing officer declined to enforce the subpoena but accepted into evidence parts of Spears' affidavit, the parts that were corroborated by other evidence. As authority for the excluding the parts of Spears' affidavit that were not corroborated by other evidence, she cited Best Western City View Motor Inn, 325 N.L.R.B. 1186, 1193 (1998) (stating that affidavits of unavailable witnesses taken by a charging party and received into evidence are only to be relied upon when consistent with "extraneous, objective, and unquestionable facts").

Associated Rubber contends that all of the affidavit should have been accepted as evidence. It points out that no witnesses at the hearing specifically refuted or contradicted the uncorroborated parts. It argues that because the hearing officer declined to enforce the subpoena for Spears to appear, she should have accepted all of the affidavit into evidence. Because the parts of the affidavit that were considered as evidence by the hearing officer provide a sufficient factual basis upon which to overturn the Board's decision, we need not decide whether it was error to exclude from evidence the uncorroborated parts of the affidavit without enforcing the subpoena for Spears' attendance at the hearing.

17

time of his mixer to the detriment of Spears, and he did so within a week after his threat to get even with Spears on behalf of the union's cause and just three days before the election was held.

Moreover – and this is important – there is no credible evidence that Brown's misconduct towards Spears was caused by anything other than his desire to carry out the threat to make Spears pay for not supporting the union. The Board's brief does not refer to any other cause;  at oral argument we asked the attorney for the Board to point us to any evidence  that Brown had some other motive to make things more difficult and dangerous for Spears, and he could not do it.  To the extent that the Board majority found to the contrary, its finding is supported by no evidence and is  contradicted by all the evidence on the point.

The record also shows the seriousness of the incident.  Barker, the general foreman, testified to the potential danger of operating the mixer at a faster cycle time, explaining that if the mill operator is unable to get all 450 pounds of the hot compound milled within the cycle time, he could have as much as 100 pounds left when the next batch drops, and more and more could build up, creating a dangerous situation for the mill operator.  Spears had less time to deal with rapidly dropping amounts of  material that he had to maneuver through the rollers of his mill.  He  repeatedly signaled Brown to slow down the cycle time,  pleas that

18

Brown ignored.  Spears  had to endure the situation for two-and-a-half hours.  As soon as he had a break, he reported the incident to his foreman, stating that the increased cycle time was "making his job extremely rough on him."  Only then was it stopped.

The Board relied heavily upon the fact that Spears did not actually sustain any physical injury from Brown's misconduct, surmising that the incident did not involve a "severe risk of injury."  That is somewhat akin to civilians telling a soldier that combat could not have been too bad because he survived it.  The seriousness of the risk of injury may well depend upon one's perspective in relation to that risk.  It is all too easy for Board members and judges  to minimize the risk  Spears was subjected to because he refused to support the union, but to one who was on that production line with 450 pounds of scorching hot rubber compound dropping down at an increased rate of speed, the risk undoubtedly and reasonably  appeared serious.  Spears' frantic action in repeating ringing the alarm bell, in complaining to his foreman at the first opportunity, and in describing what Brown did for two-and-a-half hours as "making his job extremely rough on him" all support the conclusion that it was a serious matter  and would have appeared serious to other workers in the plant.  The same is true of  Spears' statement that he was sufficiently afraid of a reoccurrence that he would resign if the union won the

election.  Against all of that on the severity scale there is only the fact that Spears was not actually injured or killed because of this opposition to the union.  We do not think that increased danger has to actually result in injury or death for it to be a decisive factor in the contest of a certification election.  No employee ought to be subjected to any increased danger  because of his position in a union certification election, and an increased risk of injury can itself be enough to have a chilling effect on the employees' right to freely decide whether they wish to be represented by a union.

Nor does the Board majority's point about Tony Gerald's coming to Spears' aid persuade us to the contrary.  The Board thought that the fact Gerald favored the union somehow lessened the seriousness of Brown's misconduct and its impact.  That is not unlike saying that if Spears had been killed, the impact  upon the election would have been lessened if some pro-union workers had shown up to pay their  respects  at the funeral.  Gerald's pitching in to help Spears is an indication of how much difficulty Spears was in and the fact that not everyone condones endangering workers because of their views about unions.

The dissenting Board member was right.  He noted that Spears did, at a minimum, experience adverse working conditions and was humiliated before his coworkers, as evidenced by the fact that the incident became a joke within the unit.

He was laughed at, something which does not ameliorate the seriousness of the incident but instead shows a different kind of harm – derision – Spears suffered.

Importantly, the incident occurred only three days before the election took place. That fact makes the incident worse and increases the impact it had on the election. The closeness of the incident to the election also diminishes any significance of the fact that the incident was an isolated event, or at least the most serious event. Given that it occurred only three days before the election, there was little time in which such an incident could reoccur.

The evidence also shows without dispute that the incident was disseminated to other employees. Spears told employee Larry Howard. And as many as five or six employees, including Brown, laughed in the break room about how Brown had "gotten" Spears. The Board majority conceded there was evidence that some employees laughed about Brown "getting them if they don't vote for the union," but it saw no evidence that those employees connected the Banbury incident to Brown's threat a week before. That conclusion is unreasonable and without any support in the record. The evidence shows without dispute that the laughter was about Brown "getting them if they don't vote for the union," and there is no evidence that anyone connected Brown's misconduct towards Spears to anything other than his threat a week earlier. As the dissenting Board member pointed out,

21

the evidence showed that at a minimum seven people (Spears, Howard, and the employees in the break room) knew of Brown's acceleration of the Banbury mixer, and all seven of them connected that misconduct  to Brown's earlier threat towards Spears.

In sum, the fact that Spears was threatened and then retaliated against in a way that placed him in  personal danger would reasonably create fear in the minds of employees who were voting in the certification election.  Although there apparently is no evidence that Spears' own vote was affected,[6] at least seven people, including Spears, knew of the incident and connected it to Brown's earlier threat, and the election results turned on two votes.  The seriousness of the incident, the degree to which news of it was disseminated before the election, its nearness to the election, and the closeness of the vote all render the Board majority's findings, conclusions, and decision  unsupported by substantial evidence.  See, e.g., Smithers Tire & Automotive Testing of Texas, Inc., 308 N.L.R.B. 72, 72-73 (1992) (setting aside an election where the union won by a

---

[6]The union highlights the absence of any evidence that Spears' own vote was affected by the incident.  While the fact that Spears did not state that he voted for the union as a result of the incident can be relevant to the effect of Brown's misconduct on freedom of choice, it is not dispositive of the issue.  See, e.g., Nabisco, Inc. v. N.L.R.B., 738 F.2d 955, 958 & n.4 (8th Cir. 1984) (evidence of threat of job loss to one employee if he refused to sign a union card did not warrant an evidentiary hearing because the union won the election by more than one vote and there was no allegation that the threat was disseminated to others); NLRB v. Van Gorp Corp., 615 F.2d 759, 764 (8th Cir. 1980) ("proof that particular votes were changed is not required in challenging an election on the basis of coercive behavior").

three vote margin and the evidence showed that two employees were threatened, as the votes of those two threatened employees could have been determinative of the election).  The Board should have ordered a new election.

## III.  CONCLUSION

Associated Rubber's petition for review is GRANTED. The Board's cross-petition for enforcement is  DENIED**.**