[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10294
_____

NLRB No. 01-CA-183197

TRANSIT CONNECTION, INC.,

Petitioner-Cross Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross Petitioner,

AMALGAMATED TRANSIT UNION LOCAL 1548,

Respondent.

_____

Petition for Review of an Order of the
National Labor Relations Board
_____

(April 13, 2018)

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and BARTLE,[*] District Judge.

BARTLE, District Judge:

Transit Connection, Inc. ("TCI"), which owns and operates a public bus system on the island of Martha's Vineyard, Massachusetts, petitions for review of a December 28, 2016 order by the National Labor Relations Board ("NLRB"). The NLRB found that TCI had engaged in unfair labor practices in violation of sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA") when it refused to bargain with the Amalgamated Transit Union Local 1548 ("Union"), which the NLRB had certified to serve as the representative for TCI bus drivers.[1] *See* 29 U.S.C. § 158(a)(1), (5).  The NLRB ordered that TCI cease and desist from refusing to recognize the Union or otherwise interfering with the drivers' right to representation.  It further ordered that TCI negotiate with the Union and thereafter execute a written agreement regarding the terms and conditions of employment for the drivers.

TCI acknowledges that it refused to bargain with the Union but asserts that the NLRB abused its discretion in certifying the Union.  It seeks to have the

---

[*] Honorable Harvey Bartle III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1] The Union's petition for representation included all full-time and regular part-time bus operators employed by TCI at its Martha's Vineyard location but excluded office clerical employees, managerial employees, dispatchers, mechanics, confidential employees, seasonal employees, guards, supervisors, and all other employees.

NLRB's order vacated.  The NLRB also has filed a cross-application for enforcement of its order requiring TCI to bargain with the Union.  *See* 29 U.S.C. § 160(e).

For the reasons stated below, we deny the petition for review and grant the NLRB's application for enforcement of its order.

I

All the events in question occurred on Martha's Vineyard, far from the Eleventh Circuit.  Nonetheless, we have jurisdiction over this appeal because TCI, although a Massachusetts corporation, also conducts business in the state of Florida.  Under the NLRA, appellate jurisdiction over an order of the NLRB extends to "any United States court of appeals in the circuit wherein . . . [the aggrieved] person resides or transacts business."  29 U.S.C. § 160(e), (f).

II

The underlying facts are not in dispute.  On January 6, 2015, the Union notified TCI by letter that a majority of its bus drivers on Martha's Vineyard had signed cards authorizing the Union to be their exclusive collective bargaining representative and requested that TCI voluntarily recognize the Union.  TCI declined to do so, and thereafter the Union filed a petition for representation requesting that TCI permit its drivers to vote on the issue.

Subsequently, TCI and the Union signed an agreement to hold an election under NLRB supervision. In anticipation of the election, TCI was required by the NLRB and the parties' agreement to provide the Union with a list of eligible voters and their addresses. TCI did identify the bus drivers to the Union. While TCI also supplied addresses, whether those addresses were legally sufficient is one of the subjects of dispute in this appeal.

TCI did not maintain a separate list of its employees' addresses because it generally communicates with them in person or via telephone. Accordingly, the general manager for TCI reviewed each employee's personnel file to obtain the addresses for the Union. Each file contained an application for employment and a copy of the employee's current driver's license. The drivers' licenses typically included only a residential address, but many employees also wrote on their employment application a mailing address, which was typically a Post Office Box ("P.O. Box"). Because of the unique mail delivery system on Martha's Vineyard, the U.S. Postal Service does not deliver to many of the island's residential locations. Thus, many residents opt instead to receive their mail at P.O. Boxes.

Approximately sixty to seventy percent of TCI's personnel files contained a P.O. Box address. On February 19, 2015, TCI delivered to the Union the names of thirty-nine bus drivers. For thirty-seven of these, the list included only residential

addresses.  For one driver, TCI identified a P.O. Box only, and for another both a residential address and a P.O. Box.

On March 10, 2015, the Union mailed voting information to the thirty-nine bus drivers.  The information included an invitation to attend a Union meeting on March 14, 2015.  Only seven drivers attended.  The Union did not attempt to visit the drivers at their homes or otherwise contact them.

On March 18, 2015, the first election took place.  The drivers voted twenty-one to eighteen against Union representation.  Thereafter, the Postal Service returned as undeliverable twenty-two of the thirty-nine envelopes the Union had mailed on March 10th.  Four of the returned envelopes contained addresses that did not match those provided by TCI, and three were addressed to individuals who had attended the March 14th meeting.  The Union then filed an objection to the election with the NLRB.  It contended that the list of drivers supplied by TCI contained invalid mailing addresses and therefore did not meet NLRB requirements.

After a hearing, an NLRB hearing officer assigned to the matter issued a report which recommended sustaining the Union's objection and ordering a new election.  Specifically, the hearing officer determined that the list provided by TCI was deficient because it failed to include the mailing addresses it had for a substantial number of eligible voters.  He found that at least eighteen, or forty-six percent, of the envelopes with mailing addresses provided by TCI and mailed by

the Union had been returned.  Thus a significant number of the bus drivers did not receive the information from the Union.  The hearing officer reasoned that the lack of information "may have impeded a free and reasoned choice" in exercising the employees' right to vote.  On August 4, 2015, a three-member panel of the NLRB adopted the hearing officer's findings and recommendations, vacated the March results, and ordered a new election.

The second election was held on September 10, 2015.  This time the bus drivers voted in favor of Union representation by a vote of seventeen to fourteen.[2] Thereafter TCI filed an objection to the election results.  TCI asserted that, prior to the election, two TCI drivers who supported the Union had threatened a third driver that they would "kill him" if he did not vote in favor of the Union.  A hearing was held on October 14, 2015.  After reviewing surveillance video of the alleged threat, the hearing officer rejected TCI's position.  Instead of an effort at intimidation, the hearing officer concluded that the statements "were made in jest, arising out of a conversation amongst friends," and determined it was "unlikely that this conduct would have created a general atmosphere of fear and reprisal that would warrant setting aside this election."  Specifically, the hearing officer found:

---

[2] Of thirty-eight eligible voters, thirty-four cast ballots.  Two ballots were deemed "challenged" and not factored into the final tally.  One was also deemed "void" and likewise not counted.

On the video, employee Walter Tomkins is seated in the driver seat of the bus, when another employee, Richard Townes boards the bus to relieve him. After Townes has boarded, another employee, John "Stevie" Edwards is seen approaching the open bus door, and begins talking with Tomkins. After a brief friendly exchange between Tomkins and Edwards, Tomkins says to Townes, "now's your time to tell him that if he doesn't vote for the union I'm going to kill him." Townes responded, referring to Edwards, "that's right, that's right, we're all going to kill him." Neither Tomkins nor Townes raised their voices, or changed their tone, to reflect aggression or malicious intent. There was no evidence presented that Tomkins or Townes were acting as agents of the Union when this exchange occurred.

The NLRB thereafter adopted the hearing officer's findings and her recommendation to allow the September election results to stand.[3]

With TCI's objection overruled, the NLRB certified the Union as the drivers' sole collective bargaining representative. TCI, however, refused to bargain with the Union in order to force a review of the Union's certification.[4] *See Cooper/T. Smith, Inc. v. N.L.R.B.*, 177 F.3d 1259, 1261 n.1 (11th Cir. 1999). In

---

[3] TCI also alleged that the Union sent the drivers a pre-election mailing that mischaracterized a recent pay raise and falsely promised that the Union would force TCI to arbitrate future labor disputes. The hearing officer rejected this objection, and TCI does not press the issue on appeal.

[4] NLRB certifications of elections under section 9(c) of the NLRA, 29 U.S.C. § 159(c), are not reviewable as final orders. *See Cooper/T. Smith, Inc. v. N.L.R.B.*, 177 F.3d 1259, 1261 n.1 (11th Cir. 1999). "As a result, an employer can obtain review of the [NLRB]'s representation decision only by refusing to bargain." *Id.* "The refusal triggers a ruling by the [NLRB] that the employer has engaged in an unfair labor practice," which is a reviewable final order. *Id.* This court "can then examine the [NLRB]'s representation decision as part of its review of the unfair labor order." *Id.*

response, the Union filed with the NLRB an unfair labor practices charge against TCI.

The NLRB's General Counsel issued a complaint alleging that TCI's actions violated the NLRA, which prohibits an employer from "refus[ing] to bargain collectively with the representatives of his employees."  29 U.S.C. § 158(a)(5). The NLRB granted summary judgment in favor of the General Counsel.  As stated above, the NLRB ordered TCI to bargain with the Union and to refrain from otherwise interfering with the drivers' right to representation.  TCI now asks us to review that decision.  In so doing, TCI challenges both the invalidation of the March election and the certification of the September election.

## III

The NLRB has "wide discretion" to decide whether an election was conducted fairly, and its decisions "warrant special respect on review."  *N.L.R.B. v. Dynatron/Bondo Corp.*, 992 F.2d 313, 315 (11th Cir. 1993) (quoting *M & M Supermarkets, Inc. v. N.L.R.B.*, 818 F.2d 1567, 1573 (11th Cir. 1987)).  "We will not overturn the [NLRB]'s decision so long as its conclusion is supported by 'substantial evidence,' viewing the record as a whole."  *Associated Rubber Co. v. N.L.R.B.*, 296 F.3d 1055, 1060 (11th Cir. 2002) (quoting *Cooper/T. Smith*, 177 F.3d at 1261).  We must accept the NLRB's factual findings, especially credibility determinations, "unless they are 'inherently unreasonable or self-contradictory.'"

8

*Id.* (quoting *N.L.R.B. v. IDAB, Inc.*, 770 F.2d 991, 996 (11th Cir. 1985)).  "So long as the [NLRB] has made a plausible inference from the record evidence, we will not overturn its determinations, even if we would have made different findings upon a *de novo* review of the evidence."  *Cooper/T. Smith*, 177 F.3d at 1261.  This deferential standard applies even where the NLRB rendered its decision on summary judgment.  *See Shore Club Condo. Ass'n v. N.L.R.B.*, 400 F.3d 1336, 1338-39 (11th Cir. 2005); *Visiting Nurse Health Sys., Inc. v. N.L.R.B.*, 108 F.3d 1358, 1359-60 (11th Cir. 1997).

## IV

We begin with TCI's contention that the NLRB wrongly invalidated the results of the March election.  The basis for the NLRB's decision lies in what is known as the *Excelsior* rule, which takes its name from *Excelsior Underwear*, *Inc.*, 156 NLRB 1236 (1966).  There, the NLRB established the following requirement for all union elections:

> [W]ithin 7 days [after the approval of an election agreement or the direction of an election], the employer must file with the Regional Director an election eligibility list, containing the names and addresses of all the eligible voters.  The Regional Director, in turn, shall make this information available to all parties in the case.  Failure to comply with this requirement shall be grounds for setting aside the election whenever proper objections are filed.

*Id.* at 1239-40.

9

As explained by the NLRB, the primary purpose of the *Excelsior* rule is two-fold:  (1) "to insure an informed electorate by affording all parties an equal opportunity to communicate with eligible employees"; and (2) "to expedite the resolution of questions of representation by minimizing challenges based solely on lack of knowledge as to the voter's identity."  *Women in Crisis Counseling & Assistance*, 312 NLRB 589, 589 (1993) (citing *Excelsior*, 156 NLRB at 1239-43).  Accordingly, the rule "ensure[s] the fair and free choice of bargaining representatives . . . by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses."  *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 767 (1969) (citation omitted).

On appeal, TCI asserts that the NLRB misapplied *Excelsior* when it vacated the March election results.  It maintains that the *Excelsior* rule required TCI to furnish a list of only the bus drivers' home addresses.  For thirty-seven of the thirty-nine bus drivers, that is what TCI did.  TCI says it cannot be penalized for what it characterizes as a "newly-articulated" extension of *Excelsior* to require mailing addresses, not just residential addresses, on a compliant list.   This argument, however, misses the mark.  It is true that *Excelsior* at times used the phrase "home addresses," and in most instances home addresses will suffice.  However, *Excelsior* never limited the production solely to home addresses.  *See*

156 NLRB at 1240-41.  We must be cognizant of its rationale and not interpret it to reach an untenable result.  Under *Excelsior*, an employer is under a duty to provide "complete and accurate*"* information as to the names and addresses of eligible voters.  *See Mod Interiors, Inc.*, 324 NLRB 164, 164 (1997).  TCI operates on Martha's Vineyard and is well-acquainted with the mail delivery system there, which it describes as "particularly complex" and "unique."  It has conceded that "mailing addresses are generally P.O. Boxes on Martha's Vineyard, and not a residential street address."  TCI also admits that it had P.O. Boxes for sixty to seventy percent of employees, yet failed to provide this information to the Union.

The *Excelsior* rule requires the employer to provide the union with employee-address information in its possession so as to facilitate the union's ability to communicate with those employees.  The rule is designed to ensure an accurate and informed vote on the question of union representation.  Supplying addresses which an employer knows are not likely to allow the union to reach the employees by mail violates the rule.  There is no reason here why TCI could not have given the Union the P.O. Box numbers or both residential addresses and P.O. Box numbers.  Indeed, it provided both in the case of one bus driver.  In another case, it supplied only the P.O. Box number.  Under these circumstances, TCI failed to provide to the Union a proper and accurate address list of its employees in contravention of *Excelsior*.

11

TCI contends that Union officials could have used the residential addresses to visit each voter in person.  This argument is without merit.  While the Union may opt to undertake personal visits, nothing in *Excelsior* requires it to do so or limits it to this means of communication.  *See Excelsior*, 156 NLRB at 1246.

TCI's reliance on *Rite-Care Poultry Co., Inc.*, 185 NLRB 41 (1970), is misplaced.  There, the employer provided an *Excelsior* list that included only the first initials of the forenames of employees.  *Id.*  It furthermore "provided only the names of the town or city where the employees lived and, in some instances, a route number," but omitted street addresses or P.O. Boxes.  *Id.*  Contrary to TCI's position, *Rite-Care Poultry* did not hold that the primary purpose of the *Excelsior* list is to permit "labor organizations to locate employees at the home addresses for the purpose of making face-to-face campaign appeals."  *Id.* at 42 n.9.  While the NLRB found that the *Excelsior* list "should be *adequate* to enable labor organizations to use the list to make such personal appeals to employees at their homes," it focused on the fact that the union had been unable to reach a substantial number of employees by mail in finding the list deficient.  *Id.* (emphasis added); *see also id.* at 42 n.10.

TCI also asserts that the Union had a responsibility to verify the addresses on its own.  TCI concedes that generally a union is justified in relying on address information provided by the employer.  *See Murphy Bonded Warehouse, Inc.*, 180

NLRB 463 (1969).  TCI argues nonetheless that "a union cannot sit by idly and knowingly ignore clear and obvious discrepancies that come to its attention."  The hearing officer, however, found here "that the Union did not become aware that there were address inaccuracies in the voter eligibility list until after the [March] election when the Postal Service returned the envelopes."  Thus, the Union did not ignore clear discrepancies that had come to its attention, at least not with sufficient time to act on them before the March election took place.

As noted above, the hearing officer found here that forty-six percent of the residential addresses TCI provided were "inaccurate or incomplete" given that at least eighteen out of thirty-nine mailings were returned as undeliverable.[5]  These employees "lack[ed] information with respect to one of the choices available" and therefore were unable to make "a more fully informed and reasonable choice" in the election.  *See Excelsior*, 156 NLRB at 1240.  As the hearing officer noted in vacating the March election results, the NLRB had previously held that an inaccuracy rate of forty percent failed to comply with the *Excelsior* rule.  *See Mod Interiors*, 324 NLRB at 164.

We conclude that the record and the law supported the NLRB's decision to sustain the Union's objection to the March election and to order a new election.

---

[5]  Though more than eighteen envelopes were returned as undeliverable, the hearing officer excluded from this figure a handful of returned envelopes with addresses that did not match those on the voter list.

The NLRB did not exceed its wide discretion in invalidating the March election, and the hearing officer's factual findings were supported by substantial evidence.

V

TCI also challenges the NLRB's refusal to vacate the September election results. TCI maintains that the NLRB hearing officer presiding over the matter erroneously concluded that the outcome was not marred by voter intimidation. As stated above, TCI points to statements made by employees Tomkins and Townes to a third employee, Edwards, that they were going to "kill" Edwards if he did not vote in favor of the Union. TCI urges us to reject several of the hearing officer's factual determinations, specifically: (1) the officer's finding that the alleged death threats were made in jest; (2) the officer's refusal to draw an adverse inference from the Union's decision not to call Edwards as a witness; and (3) the officer's failure to take the election's close margin into account when evaluating whether the threats were serious.

When a union itself engages in objectionable misconduct, the NLRB will overturn the election if the conduct "interfered with the employees' exercise of free choice to such an extent that [it] materially affected the results of the election." *TRW-United Greenfield Div. v. N.L.R.B.*, 716 F.2d 1391, 1393 (11th Cir. 1983). "If, however, a third party engages in misconduct, the party objecting to the election has the burden" to show that "the misconduct was so aggravated as to

14

create a general atmosphere of fear and reprisal rendering a free election impossible." *Associated Rubber*, 296 F.3d at 1060 (quoting *Westwood Horizons Hotel*, 270 NLRB 802, 803 (1984)). "The question of whether an individual is acting as a union agent is a factual one, and any findings the NLRB makes regarding [the issue] are afforded deference." *Id.*

Here, the NLRB concluded that Tomkins and Townes were acting as third parties, not agents of the Union. TCI does not challenge that finding on appeal. Thus, we must apply the more stringent standard for third party misconduct stated above. *See Associated Rubber*, 296 F.3d at 1060. Under that standard, we consider the following factors: "(1) whether the evidence establishes fear in the minds of the voters; (2) whether that fear affected their votes; and (3) whether, had it not been for the fear, the results of the election might have been different." *Id.* at 1061 (quoting *IDAB*, 770 F.2d at 998). We will not second-guess the factual findings of the hearing officer unless those findings were "inherently unreasonable or self-contradictory." *Id.* at 1060 (quoting *IDAB*, 770 F.2d at 996).

After review of the video of the incident which is part of the record, we conclude that the hearing officer did not abuse her discretion when she concluded that the statements were made in jest among friends. The contemporaneous view of TCI was not to the contrary. When the video came to its attention, TCI never disciplined Tomkins or Townes and never reported the matter to law enforcement.

15

The statements made by Tomkins and Townes could not have established fear in the mind of Edwards and therefore could not have affected his vote. Accordingly, the statements do not rise to the level of objectionable third party misconduct, even in light of the closeness of the election results. *See, e.g.*, *IDAB*, 770 F.2d at 993, 998-99.

Finally, we decline to draw an adverse inference against the Union for failing to call Edwards as a witness at the NLRB hearing given the fact that it was TCI's burden to establish misconduct warranting a new election. *See, e.g.*, *IDAB*, 770 F.2d at 998. Simply put, the record does not support TCI's assertion of misconduct "so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." *Associated Rubber*, 296 F.3d at 1060. The NLRB correctly declined to set aside the September election results on this ground.

## VI

In summary, it was within the NLRB's discretion to conclude that the address list TCI provided ahead of the March election did not comply with the *Excelsior* rule. And it was likewise within the NLRB's discretion to determine the September election was not tainted by voter intimidation. We have no grounds to overturn the NLRB's decision to grant summary judgment in favor of the certification of the Union to represent the bus drivers of TCI on Martha's Vineyard.

16

**PETITION FOR REVIEW DENIED; ORDER ENFORCED IN FULL.**